533 A.2d 436

Constance L. McDANIEL, as Administratrix of the Estate of Carol M. Lee, and on behalf of Paul T. Lee, a minor and Elizabeth R. Lee, Appellants,

v.

MERCK, SHARP & DOHME, the Western Pennsylvania Hospital, Kenneth Melani, M.D., Lester A. Dunmire, M.D., John H. Goodworth, M.D., Timothy Kavic, M.D. and Paul Kim, M.D., Appellees.

Superior Court of Pennsylvania.

Argued Oct. 8, 1986.

Filed Sept. 15, 1987.

Reargument Denied Nov. 17, 1987.

602

---

Frank M. McClellan, Pittsburgh, for appellants.

Raymond G. Hasley, Pittsburgh, for Merck, Sharp & Dohme, appellees.

John C. Conti, Pittsburgh, for Western Pennsylvania Hosp. and Melani, Kavic and Kim, appellees.

John W. Jordan, IV, Pittsburgh, for Dunmire and Goodworth, appellees.

Before DEL SOLE, KELLY and POPOVICH, JJ.

KELLY, Judge:

In this trespass action, plaintiff-appellant, Constance L. McDaniel, as Administratrix of the Estate of Carol M. Lee, appeals from an order of the Court of Common Pleas of Allegheny County denying her post-trial motions for the removal of a compulsory non-suit and judgment n.o.v. as to appellee, Merck, Sharp & Dohme (hereinafter Merck), and denying motions for a new trial and judgment n.o.v. as to appellees, Dr. John H. Goodworth, Dr. Timothy Kavic, and Western Pennsylvania Hospital (hereinafter West Penn). We reverse and remand this case to the Court of Common Pleas of Allegheny County for a new trial and for removal of the non-suit.

Although the legal issues presented will require extended discussion, the underlying facts may be briefly stated. On February 25, 1982, decedent, Carol M. Lee, visited appellee West Penn's emergency room complaining of a sore throat. She was diagnosed as having streptococal pharyngitis, received treatment, and was discharged. Nonetheless, her condition worsened and she returned to the hospital on February 28, 1982.

Decedent was diagnosed by appellee, Dr. Kavic (a surgical resident at West Penn), as having acute appendicitis. Decedent was admitted for surgery and put under the supervision of the hospital's surgery staff. The attending physician on that date was Dr. Dunmire.[1] Blood studies were ordered, and the first dose of the antibiotic Mefoxin was prescribed by Dr. Kim,[2] and administered.[3] Mefoxin,

---

1. Appellant does not allege that entry of the non-suit as to Dr. Dunmire was error. Accordingly, he is not a party to this appeal.

2. The trial court noted that "Dr. Kim was identified in the complaint but was never served and never filed an appearance. No allegations were raised against him in any of the complaints. He is therefore not

3. See note 3 on page 605.

also referred to as Cefoxitin, is an antibiotic belonging to a group of drugs known as cephalosporins. It is a registered trademark of Merck and is registered with the United States Food and Drug Administration.

By noon, decedent was anemic.[4] Following an appendectomy performed by Dr. Dunmire on the evening of February 28, Mefoxin was again administered. Because the supervising physician is generally assigned to the surgery staff for only a thirty day period, Dr. Goodworth assumed supervision of the case the next day, replacing Dr. Dunmire.

Post-operatively, the decedent developed a wound infection and manifested an elevated temperature. Mefoxin was continuously administered from February 28 until decedent's death on April 4, 1982, except for a three day period while Dr. Kavic was on vacation.[5] Decedent underwent three subsequent operations to treat her infection. Nevertheless, her fever continued and she developed a severe case of hemolytic anemia with bone marrow depression, which ultimately precipitated her death.

Appellant, Administratrix of decedent's estate, filed her original complaint on July 15, 1983 and amended that complaint on October 20, 1983, on March 28, 1984 and on November 10, 1984. After preliminary objections were heard, appellant's causes of actions remaining for trial included: a claim against Merck under the Restatement of Torts (Second) § 402A; claims against Dr. Melani for failure to elicit informed consent from decedent and for failure to properly perform an appendectomy and administer the

a party to this action." Trial Court Opinion at 4. On appeal, appellant asserts no error as to this finding.

3. The original complaint alleged that Dr. Melani administered the first dose of Mefoxin and failed to obtain decedent's informed consent. This claim was not pursued at trial and no error is asserted on appeal regarding possible claims against Dr. Melani.

4. Anemia is a deficiency or inadequacy of the hemoglobin in the blood.

5. There is a discrepancy in the medical records as to the exact dates the drug was discontinued. (N.T. at 438).

drug Mefoxin; a claim against West Penn for failure to properly supervise its staff; claims against Drs. Dunmire, Goodworth, Kavic and Kim for failure to consult specialists and for failure to discontinue the administration of Mefoxin post-operatively. The causes of action which were dismissed included claims against Merck under the Restatement of Torts (Second) § 402B and in tort for misrepresentation, and a claim against all defendants for punitive damages.

Trial began on June 17, 1985. During the trial, testimony of several of appellant's proferred expert witnesses was excluded, or limited in scope. In addition, reports acquired from Merck through appellant's discovery process which concern adverse reactions to the drug Mefoxin were also excluded. On June 27, 1985, following the close of appellant's evidence on the issue of liability, the trial court granted a compulsory non-suit in favor of Merck and Drs. Dunmire and Melani, and against appellant. The trial court asserted that appellant failed to present sufficient evidence that the product was defective or that lack of an adequate warning was the proximate cause of decedent's death. The trial court further noted that appellant presented no expert witness qualified to render an opinion as to the cause of decedent's death. On July 3, 1985, the jury returned a verdict in favor of the remaining defendants, Drs. Goodworth and Kavic, and West Penn.

Post-trial motions were heard and denied. Timely appeal to this Court followed. Appellant argues three allegations of trial court error on appeal, with multiple sub-arguments.

I. THE TRIAL COURT ABUSED ITS DISCRETION IN EXCLUDING, WHOLLY AND IN PART, CERTAIN EXPERT TESTIMONY.

A. The Trial Court Abused Its Discretion In Excluding The Testimony of Dr. David Gary Smith.

B. The Trial Court Abused Its Discretion In Excluding The Testimony of Dr. John Adriani.

C. The Trial Court Abused Its Discretion In Limiting The Testimony of Dr. Bennett Lorber.

D. The Trial Court Abused Its Discretion In Excluding The Testimony of Dr. Robert McCleery.

E. The Trial Court Abused Its Discretion In Limiting The Testimony of Dr. Richard Eisenstaedt.

II. THE TRIAL COURT ERRED IN GRANTING A NON-SUIT IN FAVOR OF MERCK AND DENYING McDANIEL'S REQUEST FOR POST-TRIAL RELIEF.

A. An Order Granting A Non-Suit Was Improper.

1. The court improperly excluded evidence which would have supported McDaniel's allegations that Merck manufactured and sold a defective product.

2. The trial court erred in preventing McDaniel to impeach Dr. William S. Beck.

3. The court improperly excluded evidence which would have supported McDaniel's allegations that Mefoxin caused the death of decedent.

B. The Court Erred As A Matter Of Law In Granting A Non-Suit In Favor Of Merck.

III. THE TRIAL COURT ERRED IN DENYING CLAIMS FOR PUNITIVE DAMAGES AGAINST MERCK, WEST PENN, AND DRS. KAVIC AND GOODWORTH.

We shall address these contentions *seriatim.*

## I. EXPERT TESTIMONY

### A. DR. DAVID GARY SMITH

Appellant offered into evidence the videotaped deposition of Dr. David Gary Smith, M.D. Dr. Smith was to testify to the standard of care required of the treating physicians, specifically their failure to discontinue the administration of the drug Mefoxin and their failure to obtain an appropriate consultation with a medical specialist when decedent's fever continued after her appendectomy. His testimony was also offered on the issue of causation. Dr. Smith's testimony was excluded at trial because, as the trial judge stated, Smith wasn't qualified, and "[h]e doesn't give the correct answers as to his opinion consistent with the law...."

(N.T. at 259). Appellant asserts the court's ruling was error. We agree.

■ The law regarding the qualification of witnesses as experts is well established. It is true that whether a witness has been properly qualified to give expert opinion testimony is vested in the discretion of the trial court. *Abbott v. Steel City Piping Co.*, 437 Pa. 412, 421, 263 A.2d 881, 885 (1970). "The Pennsylvania standard of qualification for an expert witness is a liberal one. 'If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his evidence is for the jury.' *Kuisis v. Baldwin–Lima–Hamilton Corp.*, 457 Pa. 321, 338, 319 A.2d 914, 924 (1974)." *Rutter v. Northeastern Beaver County School District*, 496 Pa. 590, 597–598, 437 A.2d 1198, 1201 (1981) (plurality opinion). Although the witness must demonstrate some special knowledge or skill, there is no requirement that a witness acquire that knowledge as a result of formal schooling; expertise acquired by experience is expertise nonetheless. *Gottfried v. American Can Co.*, 339 Pa.Super. 403, 489 A.2d 222 (1985). *See e.g. Rutter v. Northeastern Beaver County School District, supra; Abbott v. Steel City Piping Co., supra; Reardon v. Meehan*, 424 Pa. 460, 227 A.2d 667 (1967).

The determination of whether a witness is a qualified expert involves two inquiries:

> When a witness is offered as an expert, the first question the trial court should ask is whether the subject on which the witness will express an opinion is 'so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman.'... If the subject is of this sort, the next question the court should ask is whether the witness has 'sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'

*Dambacher v. Mallis*, 336 Pa.Super. 22, 35–36, 485 A.2d 408, 415 (1984) (citations omitted).

■ Dr. Smith is a licensed practicing physician, board certified in the specialty of internal medicine. As an attending physician, Dr. Smith is responsible to oversee and direct the care of hospitalized patients. In addition, Dr. Smith teaches as an assistant professor of medicine at Temple University and serves on the staff of Temple University Hospital. As a professor, he directs required courses in clinical decision-making. Dr. Smith has pursued a specialty in clinical epidemiology [6] and clinical decision-making; these areas do not yet receive board certification. Finally, he has prescribed and treated patients with Mefoxin, and has provided care to patients suffering from hemolytic anemia.

Due to Dr. Smith's training, education and experience, we find that he had a "reasonable pretension to specialized knowledge" on at least one of the subjects under investigation: the post-operative care of the decedent. *Kuisis, supra.* The combination of his areas of specialization, internal medicine and clinical decision-making, rendered him qualified to aid the jury in its deliberations. *Dambacher, supra.* We find that it constituted an abuse of discretion for the trial court to exclude his depositional testimony as to the standard of post-operative care.

Dr. Smith's report, filed pre-trial, refers in several instances, to the need to consult an expert in hematology "to shed some light" upon issues that Dr. Smith, by his own admission, was not qualified to render an expert opinion. These issues include decedent's bone marrow failure and the blood transfusions given decedent post-operatively. However, both in his pre-trial report, and in his depositional testimony, Dr. Smith expressed, with a reasonable degree of medical certainty, his opinions regarding: the failure to adequately evaluate the hematological problems of decedent; the effect of the continuation of Mefoxin treatment after decedent's blood values evinced a decline; and the effect of the nine-day delay in requesting expert consultation. Although Dr. Smith is not a hematologist, as a

6. Clinical epidemiology is the study, in part, of the causation and management of specific diseased conditions.

specialist in internal medicine and clinical decision-making he was qualified to testify to his opinion that a hemotologist should have been consulted; furthermore, he was qualified to testify as to the inadequate care given decedent by continuing to administer Mefoxin.

■ Exclusion of Dr. Smith's testimony constituted harmful, prejudicial, and reversible error necessitating reversal and remand for a new trial as to the causes of action against Drs. Goodworth and Kavic, and West Penn.[7]

## B. DR. JOHN ADRIANI

The trial court also excluded the testimony of Dr. John Adriani (N.T. at 27). Dr. Adriani is a medical doctor with a specialty in anesthesiology. In addition, Dr. Adriani has taught pharmacology at Louisiana State University; he edited the first edition of the American Medical Association (AMA) text on Drug Evaluations; he served on various national committees preparing standards on drug purity; he serves as a consultant with the Food and Drug Administration; he is the administrator of the blood bank at Charity Hospital in New Orleans; he inspects residency programs for the AMA.

However, by his own admission, Dr. Adriani's extensive and impressive pharmacology experience has focused on anesthetics. Although generally familiar with Mefoxin through the literature available, he has never studied or conducted research on the drug nor reviewed the clinical reports on Mefoxin. (*See* deposition transcript at 43–45).

Dr. Adriani was proffered to testify to: 1) the cause of death; 2) the inadequate supervision by West Penn of its staff; and 3) the attending physicians' failure to ascertain the source of decedent's post-operative infection and in continuing the antibiotic Mefoxin.

7. Although the trial court stated that "In that portion of the record that [appellant] did have transcribed, the ruling concerning Dr. Smith's testimony does not appear" (Trial Ct.Op. at 27), we, upon review of the record, found the ruling and appellant's request that the portion of the record concerning the ruling be transcribed. (N.T. at 259, 260).

■ The trial court properly ruled Dr. Adriani was not competent to testify as an expert on matters at issue in this case. *Kuisis, supra.* First, Dr. Adriani's pharmacology expertise was in the area of anesthetics, not antibiotics; he had no experience, either through clinical use, or through research, with the drug Mefoxin. Thus he was not qualified to express an opinion upon whether Mefoxin was the exact cause of decedent's fatal illness.[8] Secondly, Dr. Adriani's years of hospital administration were focused on the administration of a blood bank rather than upon the supervision of attending physicians or surgeons; therefore he was not qualified to express an opinion on any possible negligence of West Penn in supervising its surgical staff. Finally, Dr. Adriani's pretrial report does not reflect any opinion that specialists should have been consulted at an earlier stage of decedent's illness; therefore, Dr. Adriani could not have aided the factfinder's deliberations as to any possible negligence in failing to consult specialists. *Dambacher, supra.* While Dr. Adriani may have been qualified to express an opinion that the continued use of Mefoxin was substandard care, *by his own admission,* he had no reasonable pretension to specialized knowledge of the drug. (Deposition at 43). *Kuisis, supra.* In addition, other doctors had already testified on this issue and Dr. Adriani's testimony would only have been cumulative. Accordingly, we find that the trial court commited no abuse of discretion in excluding his testimony.

## C. DR. BENNETT LORBER

Although Dr. Bennett Lorber was permitted to testify at trial, his testimony was limited in that he was not allowed to express any opinion as to the exact cause of death. Dr. Lorber testified, to a reasonable degree of medical certainty, that Mefoxin caused decedent's fever; however, his testimony that the drug also caused decedent's hemolytic

8. We note that, had Dr. Adriani applied his extensive pharmaceutical knowledge and conducted a thorough search of the literature, or had he used the antibiotic in treating his own patients, our holding might be different.

anemia and her death was stricken by the trial court. (N.T. at 385).

■ In striking Dr. Lorber's opinion that Mefoxin caused decedent's hemolytic anemia and death, the trial court ruled, essentially, that only a hemotologist would have been qualified to express an opinion on that causation issue. "[H]is testimony indicates that he had no more expertise concerning the drug than any other physician who would prescribe it." (Trial Ct.Op. at 32). We find that the trial court's ruling was erroneous.

The standard of qualification of an expert is "a liberal one." *Rutter, supra.* Experts in one area of medicine have been ruled qualified to address other areas of specialization where the specialties overlap in practice, or where the specialist has experience in another related medical field. *See, e.g. Kearns v. Clark,* 343 Pa.Super. 30, 493 A.2d 1358 (1985) (urologist qualified to testify against surgeon to evaluate surgeon's performance in hysterectomy where urologist was familiar and had assisted in performance of other hysterectomies); *Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674 (1982) (professor of pharmacology qualified to testify to post-operative care given by orthopedic surgeon with respect to drug administered to patient); *Ragan v. Steen,* 229 Pa.Super. 515, 331 A.2d 724 (1974) (surgeon permitted to testify in medical malpractice action as to causation against radiologist where surgeon was knowledgeable through experience as to x-ray treatments); *Christy v. Darr,* 78 Pa.Cmwlth. 354, 467 A.2d 1362 (1983) (neurosurgeon qualified to testify on causation in personal injury cases where plaintiff suffered double vision and hearing loss despite objection that such testimony concerned problems outside neurosurgical specialty); *Workmen's Compensation Appeal Board v. Jones E. Laughlin Steel Corp.,* 22 Pa.Cmwlth. 469, 349 A.2d 793 (1975) (orthopedist permitted to testify to causation, and urological and pyschological effects of fractured pelvis). The rationale behind the standards enunciated in these cases is that the qualified witness need only have a *reasonable* pretension to

specialized knowledge; the standard is not set so high as to exclude the kind of testimony ordinarily available.[9]

Dr. Lorber has such a reasonable pretension to specialized knowledge. He is a licensed, practicing physician affiliated with Temple University teaching hospital. He is a board certified specialist in both internal medicine and infectious diseases. As such, he is precisely one type of specialist that appellant asserted the defendant physicians should have consulted. Dr. Lorber prescribes Mefoxin in the course of his treatment; he started prescribing the antibiotic approximately five years prior to the trial. Although he never conducted laboratory or clinical studies of the drug, nor did he conduct a complete literature search, he did read journal reports on the drug; "... as part of my job as an infectious disease physician I am required to be familiar with anticoagulants of all varieties.... I was familiar with reports of the drug Mefoxin, Cefoxitin." (N.T. at 302–303). We note that the testimony of a physician who has prescribed the drug for more than five years could certainly aid the jury in its deliberations. Dr. Lorber would also, as would any qualified physician, understand and recognize anemias and would be able to evaluate probable causes of anemias. (*See* N.T. at 332).

Accordingly, Dr. Lorber, as a specialist who is familiar with Mefoxin, both through the literature and through prescribing the drug, and who is qualified to diagnose anemias should be permitted to testify at re-trial on all issues of causation. We hold that the trial judge abused his discretion by prohibiting Dr. Lorber from expressing his expert opinion. Thus, we reverse and remand the case for a

9. While appellant's case might have benefitted from testimony of more than one hemotologist, it was for the jury, as factfinder, not the court, to evaluate the fact that appellant presented specialists from a variety of medical arenas other than from only hematology.

Different doctors will have different qualifications, some doctors being more qualified than others to testify about certain medical practices. It is, however, for the jury to determine the weight to be given to expert testimony, in light of the qualifications shown by the expert witness.

*Taylor v. Spencer Hospital,* 222 Pa.Super. 17, 24 n. 2, 292 A.2d 449, 453 n. 2 (1972).

new trial as to appellees, Drs. Goodworth and Kavic, and West Penn.

## D. DR. ROBERT McCLEERY

■ Dr. Robert McCleery was excluded from testifying at trial by a court ruling at the pre-trial conference for failure to comply with Allegheny County Local Rule 212.[10] Dr. McCleery failed to complete a written report of his expected testimony by the time appellant's pre-trial statement was filed on June 3, 1985. Accordingly, Dr. McCleery was not permitted to testify. Appellant contends this result was error. We agree.

Our Supreme Court has recently reiterated the approach appellate courts should take toward local procedural rules:

This Court's approach to the enforcement of procedural rules, whether local or state-wide, is dictated by the facts and circumstances in each individual case. To analyze otherwise would exalt procedural rules, which were created for efficiency and fairness, to a status far beyond their inherent power. "It has been our policy to overlook ... procedural errors when a party has substantially complied with the requirements of the rule and no prejudice would result. 'Procedural rules are not ends in themselves, but means whereby justice, as expressed in legal principles, is administered. They are not to be

---

**10.** Allegheny County Local Rule 212 states in part:

Rule 212 *VI

VI. In all trespass actions, and in other forms of action to the extent this rule may be applicable:

A. Plaintiff, on or before the date set forth in the notice of accompanying the publication of the trial list;

(1) Shall serve upon all parties a written statement containing:

\* \* \* \* \* \*

(d) The reports of any expert whose opinion will be offered in evidence at the time of trial. Such reports shall include the findings and conclusions of the expert.

\* \* \* \* \* \*

E. Witnesses whose identities have not been revealed as provided in paragraph VI.A(1)(b) and VI.C(1)(c) and (d), supra will not, under any circumstances whatsoever, be permitted to testify at the subsequent trial of the case.

\* \* \* \* \* \*

exalted to the status of substantive objectives.' " *Pomerantz v. Goldstein,* 479 Pa. 175, 178, 387 A.2d 1280, 1281 (1978) (citation omitted).

Additionally, this Court has previously held that local rules cannot be construed so as to be inconsistent with the prevailing state-wide rules. *See Byard F. Brogan, Inc. v. Holmes Electric Protective Company of Philadelphia,* 501 Pa. 234, 460 A.2d 1093 (1983).

*Feingold v. Southeastern Pennsylvania Transportation Authority,* 512 Pa. 567, 572, 517 A.2d 1270, 1272 (1986).

The state-wide rule which applies to the discovery of expert testimony is Pa.R.C.P. 4003.5. The rule provides that a party may learn "the substance of the facts and opinions to which the expert is expected to testify." The substance may be revealed through interrogatory answers or through reports. Pa.R.C.P. 4003.5(a)(1)(b). However, the rule does not state that exclusion of testimony is the unvarying remedy for failure to comply with discovery. Rather, an expert *may* be excluded from testifying if the court determines there are no "extenuating circumstances beyond the control of the defaulting party." *See* Pa.R.C.P. 4003.5, Explanatory Note (3).

Thus the state rule "... specifically provides that the presiding court must balance the facts and circumstances of each case to determine the prejudice to each party." *Feingold,* 517 A.2d at 1273. The basic considerations the court must weigh include:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith of (sic) willfulness in failing to comply with the court's order.

*Feingold,* 517 A.2d at 1273, *quoting Feingold v. Southeastern Pennsylvania Transportation Authority,* 339 Pa.Super. 15, 21, 488 A.2d 284, 288 (1985).

Our examination of the trial court's deliberation demonstrates no such balancing process occurred. Rather, we note that appellant, as early as November 1984, some seven months before the June 1985 trial, listed Dr. McCleery as an expert witness in answers to defendant's interrogatories. Appellant informed defendants in those interrogatories that the doctor was to testify to the defective or misbranded label attached as a package insert to Mefoxin. Furthermore, Dr. McCleery's *curriculum vitae* was attached to the interrogatories. "By allowing for early identification of expert witnesses and their conclusions, the opposing side can prepare to respond appropriately instead of trying to match years of experience on the spot." *Sindler v. Goldman,* 309 Pa.Super. 7, 12, 454 A.2d 1054, 1056 (1982). Dr. McCleery's identity and his conclusion that Mefoxin had been improperly labelled were revealed early in the discovery process. Thus, Dr. McCleery would not have been a surprise witness.

The doctor was available for deposition through the pre-trial process. Further, appellant offered defendants the doctor's working notes in place of a report. Thus, appellant made some effort to cure the lack of a report. In addition, appellant asserts the delay in receiving documents from defendants resulted in Dr. McCleery's delay in preparing a report explaining his conclusion. Appellant did not receive the requested documents until May 21, 1985, Dr. McCleery received them later that week, and the appellant's pre-trial statement (which listed Dr. McCleery as a witness but did not contain any report from the doctor) was filed on June 3, 1985, less than two weeks later and some two weeks before trial. This abbreviated time-table weighs, in a balancing process, to show there was no bad faith indicated by appellant's failure to file the doctor's report.

Accordingly, we must conclude that the trial court erred by its automatic application of the local rule of exclusion rather than by balancing the facts and circumstances of this case. *Feingold, supra.* As no surprise or prejudice to the defendants was demonstrated, and no bad faith was shown

by appellant in failing to provide the doctor's written pre-trial report, we hold that it was an abuse of discretion to exclude Dr. McCleery from testifying.

## E. DR. RICHARD EISENSTAEDT

█ Dr. Richard Eisenstaedt is a physician and associate professor of medicine at Temple University, board certified in internal medicine, hematology and oncology. He frequently consults with practicing physicians diagnosing blood problems, particularly drug-induced blood problems. (N.T. at 401). He was retained by appellant to render an opinion with respect to the cause of decedent's anemia and her death.

At trial, Dr. Eisenstaedt was not permitted to testify to the "propriety or impropriety of the blood transfusion on February 28, 1982." (N.T. at 91). The court noted that, as late as the pre-trial conference, appellant had not alleged in pleadings that the blood transfusion was a factor in the case; appellant agreed with the court. (N.T. at 90). Dr. Eisenstaedt had, in his pre-trial report, questioned the decision to transfuse decedent and concluded "[t]he role of these transfusions in her subsequent blood disease is unknown." Nonetheless, during Dr. Eisenstaedt's testimony, appellant attempted to elicit testimony "that the giving of the transfusion was a contributing factor ... because it clouded the picture with respect to allowing the physician to identify the true source of the hemolysis...." (N.T. at 431). The trial court ruled that the prejudice from admitting the changed opinion would outweigh its benefit, and in fact "would have only served to confuse the jury as to the actual claims against defendants." (Trial Ct.Op. at 40). We agree with the trial court, and affirm its disposition of this issue.

First, appellant originally failed to plead that it constituted negligence to post-operatively transfuse the decedent; appellant never requested to amend her complaint to include such a theory of negligence. Second, Dr. Eisenstaedt's pre-trial report gave no indication that the expert would

testify that the transfusion was a "contributing factor," but only that its role in decedent's demise was "unknown." Thus, defendants had no notice before trial of the doctor's change in opinion; appellant revealed the change in opinion for the first time at sidebar conference during the doctor's testimony. Appellees would have been taken by surprise at trial had such testimony been admitted. *See Ingrassia Construction Co. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478 (1984). Third, the jury was allowed to hear sufficient testimony from Dr. Eisenstaedt and others to explain the history of the blood transfusion and its impact on decedent's blood values. (*See e.g.* N.T. at 433–434, 443–449). Finally, admission of the opinion testimony would only serve to encourage the jury to improperly speculate on an extraneous matter not at issue in the trial. Accordingly, we find no abuse of discretion and we affirm the trial court's ruling excluding that opinion.

## II. NON–SUIT

The trial court granted defendant Merck a non-suit at the conclusion of appellant's case in chief. The trial court ruled that appellant failed to state a cause of action in strict liability against Merck. Appellant argues on appeal that the non-suit should not have been granted because the trial court improperly: 1) excluded testimony of expert witnesses; 2) excluded drug reaction reports; 3) and limited cross-examination of defendant's expert witness, Dr. William Beck. We grant removal of the non-suit, on the following basis.

## 1. EXCLUSION OF TESTIMONY

It is well-settled that a judgment of non-suit is properly entered if a plaintiff has not introduced sufficient evidence to establish the elements necessary to maintain a cause of action. *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983). Since we have ruled that the trial court erred in excluding the testimony of Dr. McCleery, and in limiting Dr. Lorber's testimony, we conclude appellant

was improperly prevented from presenting sufficient evidence to prove elements of strict liability against Merck; accordingly, the non-suit must be removed.

Section 402A of the Restatement (Second) of Torts imposes strict liability on the seller of any product 'in a defective condition unreasonably dangerous to the user or consumer'.... Comment (h) to the section makes clear that a product, as to which adequate warning of danger involved in its use is required, sold without such warning is in a 'defective condition'. *Incollingo v. Ewing*, 444 Pa. 263, 287, 282 A.2d 206, 219 (1971). Where a prescription drug is accompanied by proper warnings, the manufacturer is 'not strictly liable for unfortunate consequences attending the use of otherwise useful and desirable products which are attended with a known but apparently reasonable risk. *Rather, such a manufacturer is liable only if he fails to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous.'* *Baldino v. Castagna*, 505 Pa. 239, 244, 478 A.2d 807, 810 (1984). In the case of prescription drugs, the warning required is not to the general public or to the consumer but rather to the prescribing doctor.

*Makripodis v. Merrell–Dow Pharmaceuticals, Inc.*, 361 Pa.Super. 589, 595–96, 523 A.2d 374, 377 (1987) (citations omitted) (emphasis added).

■ Appellant's theory of liability against Merck was that Merck knew Mefoxin had induced hemolysis, and could cause fatal hemolytic anemia but Merck marketed Mefoxin without providing the medical community with adequate warning of these risks, and so proximately caused decedent's death. Dr. McCleery would have testified that Mefoxin's warning label was inadequate. Without McCleery's testimony, appellant was unable to establish that element of his action. Had Dr. Lorber been permitted to testify, he could have supplied another element of the action—that the improperly marked Mefoxin was a substantial factor in causing decedent's hemolytic anemia and death. *See Car-*

*recter v. Colson Equipment Co.*, 346 Pa.Super. 95, 499 A.2d 326 (1985).

Accordingly, we remand for removal of the compulsory non-suit as to appellee Merck.

## 2. EXCLUSION OF EVIDENCE

Appellant contends the trial court erred by refusing to compel defense expert witness Dr. Christopher Martin to appear at trial. Appellant claims to have attempted to serve a subpoena on Dr. Martin unsuccessfully, prior to trial. Although this issue is moot in light of our remand for new trial, and removal of the non-suit, we note that the court had the power to enforce a valid subpoena. *See* 42 Pa.C.S.A. § 5905. As appellant failed to either produce her subpoena, or to take advantage of the court's ability to enforce the alleged subpoena, we conclude appellant's argument in this matter has no merit. (*See* N.T. at 9–12).

█ Appellant also contends that the trial court erred by excluding reports detailing adverse drug reactions, including anemia, blood dyscrasia and bone marrow depressions, occurring after Mefoxin was administered. (N.T. at 595–598). The reports were intended to demonstrate Merck's knowledge of the risks of Mefoxin which appellant claims was not communicated to the medical community. The trial court based its ruling excluding the reports upon the fact that appellant offered the reports in evidence without any supporting testimony, and that the reports were "sufficiently technical, complex" that they required an expert's explanation. (N.T. at 598). Appellant explained she intended to have Dr. Martin explain the reports to the jury. The reports were indeed technical and complex and not capable of aiding the jury without an accompanying expert explanation. On appeal, appellant argues the reports could have been explained by Dr. McCleery, had he been permitted to testify. We note this issue is also moot in light of our remand for a new trial. However, on re-trial, should appellant present the reports with an expert whose testimony

would explain their significance, the evidence should be admitted.

### 3. CROSS-EXAMINATION OF DR. BECK

 Appellant argues the trial court erroneously limited cross-examination of defense expert witness, Dr. William Beck. Dr. Beck testified that he had conducted a search of the medical literature regarding Mefoxin and anemias. (N.T. at 703). Appellant then sought to cross-examine Beck, using medical authorities and treatises, to impeach Beck's statement that Mefoxin was only rarely reported to be associated with anemia. The court, in sustaining objection to the use of any treatise with which Dr. Beck was unfamiliar, stated:

> You can ask him about any publication in the world—let me finish—but he says I am not familiar with it, the publication, the article or the doctor, that is the end of it.
>
> [Appellant's counsel]: Fine, your Honor.
>
> THE COURT: You are not going to go into Dr. A who appeared here three days ago, recognize it. You argue that to the jury.
>
> [Appellant's counsel]: No, your Honor. I think what we are saying is that the law, so long as any witness has testified that the journal or article or book is authoritative one can use it on cross examination.
>
> I don't think you have to have the particular witness who is being cross examined, someone has to authenticate it during the—
>
> THE COURT: That is not the law as I understand it. . . .

(N.T. at 744). The opinion of an expert witness may be tested by reference to standard works, *Cummings v. Nazareth Borough*, 430 Pa. 255, 242 A.2d 460 (1968), or to the works of others which the witness considered in forming his opinion. It is also proper to show that an expert is unfamiliar with the literature in a particular field. *Cummings v. Nazareth Borough, supra.*

Alternatively, as long as appellant has produced her own expert to verify that the particular publications are authoritative in the field, an expert witness may be tested by reference to those publications. *Evanuik v. University of Pittsburgh Western Psychiatric Institute and Clinic,* 234 Pa.Super. 287, 338 A.2d 636 (1975). *Accord Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674 (1982); *Foster v. McKeesport Hospital,* 260 Pa.Super. 485, 394 A.2d 1031 (1978).

Thus, we conclude the trial court erred in its interpretation of the law; where "Dr. A who appeared here three days ago" recognized a treatise as authoritative, appellant should have been able to use that treatise as a basis for cross-examining Dr. Beck. *See Evanuik, supra.* Appellant did not attempt to further cross-examine Beck with reference to treatises appellant's experts had authenticated; however, in light of the trial court's overbroad ruling, appellant's continued attempts would likely have been futile. Accordingly, if appellant at re-trial properly attempts to cross-examine appellees' expert by reference to a text which has been authenticated as authoritative, through the prior testimony of a qualified expert, such cross-examination should be permitted.

### III. PUNITIVE DAMAGES

Appellant argues the trial court erred in denying claims for punitive damages against appellees. The trial court, in response to appellee's preliminary objections, dismissed the claim for punitive damages because appellant had pled "nothing but conclusory statements that the conduct of the defendants was 'willful, wanton and reckless' ... without allegations of fact in support thereof." (Trial Ct.Op. at 34). We affirm the trial court's ruling on this issue with regard to appellees Dunmire, Kavic and West Penn, but reverse as to appellee Merck.

Pennsylvania has adopted the principles of the Restatement of Torts (Second) § 908(2) governing punitive damages.

Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Punitive damages may not be awarded for misconduct which constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *See Martin v. Johns-Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985) (per Hutchinson, J. with one justice concurring and four justices concurring in the result). Appellant failed to allege any facts in its complaint against defendant physicians, or hospital, other than those which would constitute ordinary negligence. Accordingly, we affirm the trial court's dismissal of the punitive damages claims as to those defendants.

■ However, appellant pled sufficient facts to allow a punitive damages claim against Merck. Appellant's complaint alleged that appellee Merck knew of a serious risk of illness and death resulting from Mefoxin use, and deliberately and negligently failed to communicate that knowledge to the medical community. This allegation concerning Merck's culpable state of mind provided a sufficient basis for a punitive damages claim because it alleged misconduct on Merck's part beyond that conduct required in the underlying strict liability claim. "The state of mind of the actor is vital [in a punitive damages claim]." *Feld v. Merriam*, 506 Pa. 383, 396, 485 A.2d 742, 747 (1984). Where appellant in pleadings alleged facts that demonstrate the requisite state of mind, punitive damages may be awarded. Accordingly, we reverse the trial court's dismissal of the punitive damages claim as to appellee Merck.

Order reversed; case remanded for new trial as to appellees Western Pennsylvania Hospital and Drs. Goodworth and Kavic, and for the removal of the compulsory non-suit

and a new trial as to appellee Merck, Sharp & Dohme, consistent with this opinion. Jurisdiction relinquished.