654 A.2d 1159

**COMMONWEALTH of Pennsylvania,**

v.

**Daren S. BROWDIE, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 14, 1994.

Filed Feb. 8, 1995.

644

Robert L. Foreman, Pittsburgh, for appellant.

Michael Streily, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

Before DEL SOLE, FORD ELLIOTT and BROSKY, JJ.

FORD ELLIOTT, Judge:

Appellant was charged with criminal homicide, 18 Pa.C.S.A. § 2501, as a result of the death of his nine-month old step-daughter by traumatic asphyxiation. A jury, charged on murder in the third degree and involuntary manslaughter, found appellant guilty of murder in the third degree, pursuant to 18 Pa.C.S.A. § 2502(c). Following the denial of timely post-trial motions, appellant was sentenced to a period of incarceration of not less than eight (8) nor more than sixteen (16) years. This appeal followed. We affirm.

Appellant raises five issues on appeal:

I. Was the [appellant] entitled to have the jury instructed on voluntary manslaughter?

II. Was the pediatrician [Dr. Davis] competent to testify as to the cause of death?

III. Was the test used as the basis for the pediatrician's testimony established as being generally accepted in the appropriate field of medicine?

IV. Was the [appellant] improperly restricted in his cross-examination of the pediatrician?

V. Did counsel for the Commonwealth violate the rules of discovery by withholding, for months, information of a change in the forensic pathologist's expert opinion until the day of trial?

We will address these issues in order after a brief review of the relevant facts.

The victim, Lindsay Whitaker, was born September 30, 1990, and died July 21, 1991. Her mother Shannon, a single parent, became acquainted with appellant in late January 1991. In the months that followed, Shannon and appellant became romantically involved, marrying in mid-April 1991. (Notes of testimony, 10/13/92 at 63, 65–66.) From the beginning of their relationship, appellant appeared to have a strong interest in Lindsay, often offering to bathe her, change her, or feed her, even to the exclusion of other caregivers. (Notes of testimony, 10/13/92 at 36–38, 63–65.)

In late April or early May 1991, Shannon for the first time began to notice small bruises on Lindsay's back, along her hairline, and on her arms. (Notes of testimony, 10/13/92 at 70.) The bruising, always in different places, continued throughout the late spring and early summer, with the result that Shannon repeatedly sought medical treatment for Lindsay in an attempt to diagnose the cause. During this same period, appellant was increasingly entrusted with Lindsay's care while Shannon attended school or worked. As the weeks passed, however, Lindsay developed a "daddy fear"[1] of appel-

1. This is the term used by Shannon to describe Lindsay's reaction to appellant.

lant, and cried whenever he appeared. She did not react like this to other males. (Notes of testimony, 10/13/92 at 70–74.)

By early July, Lindsay was screaming constantly when appellant held her. Having been told that Lindsay was just going through a stage, and that Lindsay would "warm up" to appellant if she could not choose her mother, Shannon arranged special "daddy and Lindsay" times. During one of these, on July 7, 1991, Shannon returned after only a moment's absence during which she had left appellant giving Lindsay a bottle to find that Lindsay had stopped breathing and passed out. Lindsay revived immediately after appellant handed her to Shannon. An examination in the emergency room at Children's Hospital revealed an enlarged liver. (Notes of testimony, 10/13/92 at 76–80.) Subsequent examinations during check-ups on July 10 and 11, 1991, revealed more bruising and a large red pinch mark on Lindsay's side. The examination also revealed a slightly enlarged liver. In addition, test results from Children's Hospital indicated abnormal liver function. As a result, the pediatrician who examined Lindsay called in a hematologist to assist him in evaluating Lindsay's condition. (Notes of testimony, 10/13–15/92 at 81, 264–266.)

The following Sunday, July 14, 1991, Shannon found Lindsay convulsing in her crib moments after appellant took her into the bedroom and closed the door. Appellant was standing beside the crib watching and had made no effort to seek help from Shannon, who was trained in infant CPR, during the 20 seconds he said Lindsay had been "like that." (Notes of testimony, 10/13/92 at 82–87, 101.) Following a battery of tests at Children's Hospital on the 14th, Lindsay was then admitted for four more days of testing on the 15th. During her hospital stay, the bruises faded and there were no additional seizure-like episodes. (Notes of testimony, 10/13/92 at 91.) Test results revealed a possible healing fracture of the tibia: the abdominal ultrasound and CT scan were normal. (Notes of testimony, 10/15/92 at 332–337.)

One week later, on Sunday, July 21, 1991, Lindsay Whitaker was found dead in her crib in the morning when her mother,

informed by appellant that "Lindsay doesn't look good," rushed into her room. Lindsay was cold and hard to the touch, her tongue was swollen and protruding from her mouth, and she was gray in color. It was determined that rigor mortis had already set in; Lindsay had been dead for several hours. (Notes of testimony, 10/13–14/92 at 100–101, 194–195, 197, 202.) Appellant's statement to the police concerning the events of the previous evening was as follows:

[APPELLANT]: Shannon put the baby to bed about 12:30, quarter to one, and she was sleeping and Shannon went to bed and I was up for a little bit and she was still sleeping and then I came in her bedroom to go to the bathroom, which was right next door to her room and I was being as quiet as possible and I must a [sic] made a little bit of a noise and she started fussing, she started crying. . . . And, you know, I thought why has she woken up, so I went over to the crib and I picked her up and I was holding her for like four minutes. I was holding her kinda tight . . . I was holding her kinda tight, yes.

[POLICE OFFICER]: . . . [W]hy were you holding her tight like that?

[APPELLANT]: Well, to keep her from falling and also she was fussing severely.

[POLICE OFFICER]: O.K., did it frustrate you that she was fussing severely and that's why you were holding her so tightly?

[APPELLANT]: Yea, I realize why she would, she never wakes up in the night. She never, I mean, she sleeps, she's a good baby, she sleeps through the night . . . And I was wondering . . . she had her bottle and she should have been sleeping and I was ready to go to bed and I didn't want, you know, Shannon to wake up and be upset and everything and wonder.

[POLICE OFFICER]: O.K., and at what point in time then did she quit fussing and she stopped moving?

[APPELLANT]: I'd say at like, like a little bit before two.

[POLICE OFFICER]: I mean, after you were holding the baby, how long did it take before the baby quit moving all together?

[APPELLANT]: Like four minutes....

[POLICE OFFICER]: O.K., when you looked at the baby, did you realize the baby was dead?

[APPELLANT]: Not at first and then, then when I laid her in her crib she, she wasn't moving very, she wasn't moving.

[POLICE OFFICER]: She wasn't moving ... O.K., did you realize she was dead at that point?

[APPELLANT]: Very much so, yes.

[POLICE OFFICER]: And what did you do then?

[APPELLANT]: I couldn't sleep very well and I didn't know what to do, I knew that the morning would come soon and I would have to, and we would have to deal with it.

(Notes of testimony, 10/14/92 at 243, transcript of appellant's statement attached to trial court opinion.)

 Appellant's first issue concerns the charge to the jury. When reviewing a jury charge, an appellate court must look at the charge as a whole before deciding to reverse. Alleged errors in jury instructions must be considered in relation to the entire charge and in light of the evidence. *Hahn v. Richter*, 427 Pa.Super. 130, 628 A.2d 860 (1993).

 Appellant requested a charge on voluntary manslaughter, to which the prosecution assented. The trial judge, however, refused to read the "heat of passion" manslaughter charge, which provides:

(a) General rule.—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

18 Pa.C.S.A. § 2503(a). "Serious provocation" is defined at 18 Pa.C.S.A. § 2301 as "[c]onduct sufficient to excite an intense passion in a reasonable person." Appellant alleges that the trial court was required to charge the jury on "heat of passion" voluntary manslaughter if requested to do so. In support of his argument, appellant cites a line of cases the precursor of which was *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142, *cert. denied,* 419 U.S. 1000, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974). As the learned trial judge opined in his analysis of the case law in this area, however:

> The law in this area has evolved slowly. In *Commonwealth v. Jones,* [citation omitted] the supreme court held that a defendant under indictment of murder was entitled, upon request, to have the jury advised of its power to return a verdict of voluntary manslaughter. Although *Jones* was based upon a killing under the Penal Code of 1939, the rule was extended to cover a murder brought under the Crimes Code of 1972.
>
> *See Commonwealth v. Manning,* 477 Pa. 495, 384 A.2d 1197 (1978). Then, in *Commonwealth v. Carter,* 502 Pa. 433, 466 A.2d 1328 (1983), it was held that the rule of *Jones* had no application to 'unreasonable belief' voluntary manslaughter. *Carter* did not decide the propriety of charging the jury on 'heat of passion' voluntary manslaughter in the absence of evidence of such passion.

(Trial court opinion, 5/5/94 at 8.) We are, therefore, left with two issues: first, was there any evidence of "heat of passion" as delineated in the statute; and second, if not, was the trial court required to charge on "heat of passion" voluntary manslaughter absent any evidence supporting such a verdict?

The first issue is the simpler. As the trial court said, it had seen "absolutely not one scintilla of evidence of voluntary manslaughter." (Notes of testimony, 10/23/92 at 1232.) Even if we were to give credence to appellant's testimony that he was under stress as a result of the events of the previous two weeks, his wife's angry outbursts, and his parents' disapprobation (*see* notes of testimony, 10/21/92 at 969–979), nevertheless, this court adamantly refuses to extend the definition of "seri-

ous provocation" for purposes of a "heat of passion" voluntary manslaughter verdict to include squeezing a nine-month old infant to death due to frustration with her fussing. Additionally, appellant's leaving the baby in her crib all night instead of asking his wife, who was trained in infant CPR, to try to resuscitate the child, removes any shred of spontaneity from this crime. Having determined that the trial court was correct in finding no evidence to support a finding of voluntary manslaughter, we next turn to the issue of whether appellant was entitled to a voluntary manslaughter charge upon request, absent such evidence.

Different panels of this court, interpreting *Carter, supra,* have come to different conclusions on this issue. In *Commonwealth v. Mignogna,* 401 Pa.Super. 188, 585 A.2d 1 (1990), *appeal denied,* 530 Pa. 660, 609 A.2d 167 (1992), a panel of this court held:

> While we agree that *Jones* requires the provision of a heat-of-passion voluntary manslaughter instruction to a jury upon request and even in the absence of evidence to support it, we observe that the principle of *Jones* was greatly eroded by the supreme court in *Commonwealth v. Carter* [citation omitted].... [S]ince *Carter* overruled *Jones* only as to the issuance of an instruction on section 2503(b) [unreasonable belief voluntary manslaughter], we have held that we are obligated to apply the rule of *Jones* where a request for a heat-of-passion instruction has been made.

*Id.* 401 Pa.Super. at 203–04, 585 A.2d at 8, *citing Commonwealth v. Mays,* 361 Pa.Super. 554, 523 A.2d 357 (1987).

On the other hand, several panels of this court have held that a trial court does not commit error:

> by refusing a defense request to charge on 'heat of passion' voluntary manslaughter where such a defense was not made an issue at trial and where the evidence would not reasonably have supported such a finding. We are unable to conclude rationally that a different rule should obtain where voluntary manslaughter is based on 'heat of passion' than where it is based on 'unreasonable belief.'

*Commonwealth v. Toledo*, 365 Pa.Super. 224, 231, 529 A.2d 480, 484 (1987). As the *Toledo* court argued:

> The fact that *Jones* has not been overruled expressly by the Supreme Court does not mean that inferior courts can blithely ignore the subsequent history of its holding or the guidance given by the Supreme Court in the foregoing footnote.[2]

*Id.* at 231, 529 A.2d at 484. Similarly, another panel of this court in *Commonwealth v. Hernandez*, 412 Pa.Super. 485, 489–91, 603 A.2d 1039, 1042 (1992), ruled that "no vestige of *Jones* remains," and that, absent supporting evidence, no charge on "heat of passion" voluntary manslaughter need be given upon request.

We are persuaded by the latter argument. The *Jones* rule had its basis in the common law "mercy dispensing power" of the jury. *Jones*, 457 Pa. at 568–70, 319 A.2d at 146. Then Chief Justice Nix, who authored the *Jones* opinion, opined in his dissent in *Manning, supra,* that the enactment of the 1972 Crimes Code provided the court with an opportunity to reassess the "wisdom and present utility" of such common law principles:

> In my judgment neither lesser included offense nor the mercy dispensing power provide a compelling reason for the

**2.** The court is referring to a footnote in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), in which the supreme court stated, without dissent that:

> There is little or no vitality left to this practice which stems from this Court's decisions in *Commonwealth v. Jones* and *Commonwealth v. Manning* 477 Pa. 495, 384 A.2d 1197 (1978). The continuing validity of the rule was seriously undermined by our decisions holding that an instruction on involuntary manslaughter may be given *only* where the evidence would support such a verdict. The death knell to the practice regarding instructions on voluntary manslaughter was sounded in *Commonwealth v. Carter* wherein a majority of this Court held that a trial court may charge on the 'unreasonable belief' subclass of voluntary manslaughter only where evidence exists that would support such a verdict. The majority did not decide the propriety of the practice of charging the jury on 'heat of passion' voluntary manslaughter in the absence of evidence, although the concurring opinions of this author and Mr. Justice McDermott would have abolished that practice as well.

*Id.* 504 Pa. at 450 n. 10, 475 A.2d at 711 n. 10 (citations omitted).

adoption of the [*Jones*] rule today by the majority. An analysis of the lesser included offense approach would suggest that it is only compelling in those instances where there exists a factual dispute as to the presence or absence of an element of the greater offense, which element is *not* a component part of the lesser offense. . . . Where the controversy centers around elements common to both the greater and the lesser offenses, it is arbitrary and capricious to allow a fact finder the freedom to choose the verdict to be returned.

I am also unimpressed by those arguments offered by those who advocate vesting in the jury some undefined quantum of 'mercy dispensing power.' As noted in [*Commonwealth v.*] *Gartner and Pfaff*, [475 Pa. 512, 381 A.2d 114] (1977) 'the term "mercy dispensing power" is merely an [sic] euphemism to justify a rationally unsupportable verdict.' 'Not only does this approach invite arbitrary action by juries, it also leaves a reviewing court powerless to ascertain and to remedy discriminatory verdicts.'

*Manning*, 477 Pa. at 504, 384 A.2d at 1201 (Nix, J. dissenting) (citations omitted) (emphasis in original). We agree.[3]

■ Furthermore, even if appellant were entitled to a charge on voluntary manslaughter, we agree with the Commonwealth that he has not been prejudiced by its omission. The trial court *did* charge the jury on involuntary manslaughter.[4] (Notes of testimony, 10/23/93 at 1311–1312.) As a result, the jury could have exercised whatever "mercy dispens-

---

**3.** Our position is strengthened by our supreme court's recent statement in *Commonwealth v. Williams*, 537 Pa. 1, 30–31, 640 A.2d 1251, 1266 (1994), that *Carter, supra*, held that the trial court *may* charge on voluntary manslaughter only where evidence exists to support such a verdict. The supreme court appears to be saying that, not only is the trial court under no mandate to charge the jury on voluntary manslaughter when such a charge is requested, the court *may not* charge on voluntary manslaughter absent evidence to support such a verdict.

**4.** 18 Pa.C.S.A. § 2504(a) General rule.—A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

ing power" it has by finding appellant guilty of involuntary manslaughter instead of murder in the third degree. Even the *Mignogna* court, which followed the *Jones* rule, found that the failure to charge on voluntary manslaughter, "heat of passion" was harmless error where the jury was instructed on a lesser degree of culpability than the one on which they returned a verdict. *Mignogna*, 401 Pa.Super. at 202–04, 585 A.2d at 8. *See also Commonwealth v. Mays*, 361 Pa.Super. 554, 523 A.2d 357 (1987); *Commonwealth v. Haynes*, 395 Pa.Super. 322, 577 A.2d 564 (1990); *Commonwealth v. Griffin*, 357 Pa.Super. 308, 515 A.2d 1382 (1986).

■ Appellant's next three issues relate to the admissibility of testimony by Dr. Davis, a pediatrician in charge of Children's Hospital's emergency department. The first of these relates to the trial court's decision to allow Dr. Davis to testify as to the cause of death, and to base her finding on her review of the autopsy report. Appellant argues that, while Dr. Davis was eminently qualified in her field of expertise, that expertise did not include determining the cause of death, nor did it include reviewing autopsy reports. (Appellant's brief at 16–17.) In support of his argument, appellant cites *McDaniel v. Merck, Sharp & Dohme*, 367 Pa.Super. 600, 533 A.2d 436 (1987), which held that an anesthesiologist with extensive and impressive pharmacology experience in anesthetics was not qualified as an expert to give testimony regarding the cause of death of a patient who died, allegedly from negligent administration of an antibiotic. *Id.* at 609–13, 533 A.2d at 441–442.

■ In order for this court to overrule a decision by the trial court on the admissibility of expert testimony, we must find an abuse of discretion. As this court has recently stated:

'The determination of whether a person is qualified as an expert in [a] particular field is left to the discretion of the trial judge. Furthermore, that determination is based solely on whether their opinion will aid the trier of fact in finding the truth of the issues involved.' ... And, we will not reverse such a determination absent a clear abuse of discretion.

*Commonwealth v. Berrena,* 421 Pa.Super. 247, 251, 617 A.2d 1278, 1280 (1992) (citations omitted). In addition, in Pennsylvania, the standard of qualification of an expert is a liberal one:

> 'If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his evidence is for the jury.'

*McDaniel,* 367 Pa.Super. at 608, 533 A.2d at 440 (citations omitted). Furthermore, Pennsylvania allows a physician to testify in a field outside his or her area of specialty, providing the physician has experience in another related field or the areas overlap. *See, e.g., Kearns v. Clark,* 343 Pa.Super. 30, 493 A.2d 1358 (1985) (urologist qualified to testify regarding surgeon's performance of a hysterectomy where urologist had assisted in performance of other hysterectomies); *Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674 (1982) (pharmacology professor qualified to testify regarding drug administered to patient post-operatively by orthopedic surgeon).

In the instant case, Dr. Davis is the medical director of the Emergency department at Children's Hospital, an Associate Professor of Pediatrics at the University of Pittsburgh School of Medicine, and a member of the Attorney General's medical legal advisory board on child abuse and neglect. In addition, Dr. Davis performed 58 autopsies and assisted in 24 others while in medical school. She has also been required, as part of her duties as medical director since 1978, to "review every case in which a patient undergoes cardiopulmonary resuscitation, dies in the Emergency department or is dead on arrival, and part of that review includes reviewing the postmortem findings or the reports whether from [the hospital's] department of pathology or from the coroner's office." (Notes of testimony, 10/19/92 at 588.) Furthermore, her duties on the Attorney General's advisory board require her regularly to discuss and consult with forensic pathologists in order to determine whether a child fatality is the result of abuse or some other cause. (Notes of testimony, 10/19/92 at 588–589.) As a result of the foregoing, we cannot find that the trial court

abused its discretion by allowing Dr. Davis to testify as to the cause of Lindsay's death, nor to her basing that finding in part on an autopsy report prepared by a forensic pathologist.

■ Appellant's next issue with Dr. Davis' testimony concerns her use of a theory she and her colleagues extrapolated from an article in a technical journal on the relationship between elevated liver enzymes and child abuse. Appellant agrees that the article itself was admissible, having met the standard enunciated in *Commonwealth v. Dunkle*, 529 Pa. 168, 602 A.2d 830 (1992):

> This Court has long recognized that in order for an expert to testify about a matter, the subject about which an expert will testify must have been 'sufficiently established to have gained general acceptance in the particular field to which it belongs.'

*Id.* at 173, 602 A.2d at 832 (citations omitted). Nevertheless, appellant argues that Dr. Davis' theory, that elevated liver enzymes could result from a bruise to the liver not recorded on a CT scan, was not admissible because the theory was not generally accepted in any field. (Appellant's brief at 20.) Appellant appears, however, to have hoisted himself on his own petard by citing *Frye v. United States*, 293 F. 1013 (D.C.1923), in which the standard adopted by many jurisdictions, including Pennsylvania, was stated as follows:

> '... while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.'*

*Commonwealth v. Nazarovitch*, 496 Pa. 97, 101, 436 A.2d 170, 172 (1981), *quoting Frye*, 293 F. at 1019 (emphasis in original). In the instant case, Dr. Davis' theory is nothing more than a logical deduction from the admittedly acceptable journal article. (Appellant's brief at 18.) The article reported that three out of four children with elevated liver enzyme levels had lacerations to the liver that were documented by later CT scans. (Appendix to appellant's brief, and notes of testimony,

10/19/92 at 693.) A logical inference is that the fourth child had the type of liver injury that would not appear on a CT scan, such as a bruise. This is Dr. Davis' theory, which the jury was free to give whatever weight it felt the theory deserved.

In addition, even if Dr. Davis' theory were somehow inadmissible, neither her theory nor the journal article were the basis for Dr. Davis' findings as to cause of death. Rather, her finding that death was caused by traumatic asphyxiation was based solely on the autopsy report and the hospital reports. (Notes of testimony, 10/19/92 at 630–642, 666–667.) As a result, appellant can claim no prejudice in this regard.

■ The last issue appellant raises with regard to Dr. Davis' testimony is that the trial court erred in restricting the scope of appellant's cross-examination of Dr. Davis regarding the "classic findings, risk factors and red flags of child abuse." (Trial court opinion, 5/5/94 at 14, *citing* Statement of Matters Complained of on Appeal at 5.) In particular, appellant claims that Dr. Davis opened the door to questions about the profile of a child abuser when she responded to a question from defense counsel as follows:

Q: May I also assume correctly that no such [child abuse] report was made by you or the emergency department in this case?

A: That's correct. And the reason for that was that we felt at the time [Lindsay] was seen initially that she could well have had a bleeding disorder or bleeding related to her hepatic dysfunction. It was not until further studies had been done that we were able to rule that out. We also had a parent who was very warm, caring, interacting very well with the child who seemed appropriately concerned and was not conveying to us major risk factors and red flags that we ordinarily see in abuse cases.

(Notes of testimony, 10/19/92 at 644, 689–692.) When defense counsel attempted to pursue this topic, asking Dr. Davis to testify as to the classical backgrounds and behavior of child

abusers, the Commonwealth objected. The trial court sustained the objection based on the irrelevance of the testimony and Dr. Davis' lack of qualification to testify as to the psychological profile of child abusers. (Notes of testimony, 10/19/92 at 688–692.)

As stated *supra*, we review a trial court's decisions on the admissibility of evidence under a "clear abuse of discretion" standard. *Commonwealth v. Johnson*, 536 Pa. 153, 157, 638 A.2d 940, 942 (1994). While we may have ruled otherwise on the *relevance* of testimony as to the psychological profile of child abusers to this case, nevertheless, we do not find a clear abuse of discretion. Appellant was not allowed to cross-examine *this witness* on this issue. He was not, however, precluded from introducing his own expert witness to testify as to the psychological aspects of child abuse as part of a strategy to draw attention to Shannon as the possible abuser. (Notes of testimony, 10/19/92 at 700–703; appellee's brief at 60.) It would therefore appear that the trial judge was more concerned with the qualifications of this medical doctor, who had been qualified as an expert on cause of death, to testify as an expert regarding a psychological issue. (Notes of testimony, 10/16–19/92 at 549, 692.) In addition, the trial court offered to cure any prejudice Dr. Davis' comments may have caused by giving a limiting instruction; however, this offer was declined by defense counsel. (Notes of testimony, 10/19/92 at 692, 703.) As a result, appellant cannot now be heard to claim prejudice.

This brings us to appellant's final issue; namely, that the Commonwealth violated Pa.R.Crim.P. 305 [5] by not disclos-

---

5. Rule 305 provides in pertinent part:
 B. Disclosure by the Commonwealth.
 (1) *Mandatory.* In all court cases, on request by the defendant ... the Commonwealth shall disclose to the defendant's attorney ...
 ....
 (e) results or reports of scientific tests, expert opinions ...
 ....
 D. Continuing Duty to Disclose. If, prior to or during trial, either party discovers additional evidence ... which is subject to discovery or inspection under this rule ... such party shall promptly notify the opposing party or the court ...

ing prior to trial that Dr. Hiserodt would testify that "squeezing," as opposed to punching or falling, was the likely cause of Lindsay's death. (Appellant's brief at 25.) The basis for appellant's claim of unfair surprise is that at the coroner's inquest, Dr. Hiserodt testified that Lindsay died of blunt force trauma, which includes punching, falling from a significant height, or squeezing. (Transcript of coroner's hearing [Tr.] at 9–10.) Of these, Dr. Hiserodt opined that squeezing was the least likely. (Tr. at 10, 16.) Dr. Hiserodt, a relatively inexperienced pathologist at the time the autopsy was performed (see notes of testimony, 10/15/92 at 378–384), noted that Lindsay had hemorrhages to internal organs including the pancreas and the adrenal gland, a bruised lung, a fractured rib, and a subdural hematoma. (Notes of testimony, 10/16/92 at 339–400, 402.) Until he reviewed his notes and reports in preparation for trial and consulted with senior pathologists, he was of the opinion that such injuries were more likely the result of a punch or a fall than a squeeze. (Tr. at 16, notes of testimony, 10/16/92 at 402–407, 504–508.) Several months before trial, however, Dr. Hiserodt decided that squeezing, when applied to a baby, was the most logical explanation for the injuries suffered by Lindsay. Dr. Hiserodt maintained in his testimony that a "squeeze" is the layman's term for traumatic asphyxiation, in which death results from lack of oxygen due to the inability of the chest to expand to take in air. (Notes of testimony, 10/16/92 at 406.) As a result, when he and counsel for the Commonwealth met on October 13, 1992, to go over Dr. Hiserodt's testimony, Dr. Hiserodt interjected the term "traumatic asphyxiation" for the first time. (Notes of testimony, 10/16/92 at 407.)

Appellant bases his claim of unfair surprise on the fact that he learned of Dr. Hiserodt's "new" theory on the first day of trial, October 13, 1992, and that his trial strategy was thereby compromised. (Appellant's brief at 28.) The trial court, in denying appellant any Rule 305 relief, ruled that appellant had been put on notice of the possibility of a "squeezing" theory either by Dr. Hiserodt's own testimony at the coroner's inquest, in which he interjected it as the third choice mechanism

of cause of death, or by Dr. Davis' report in which Dr. Davis stated with a high degree of medical certainty that Lindsay died as a result of:

> severe crushing blunt force trauma.... [I]t is quite possible that Lindsay could have become hypoxic (low oxygen) following the head injury or more likely died as a result of lack of oxygen from crushing of her chest and abdomen and/or prolonged chest and abdominal compression, or some other form of suffocation.

(Notes of testimony, 10/16/92 at 412; Commonwealth Exhibit 1 at 5–6.)

Appellant attempts to argue that his strategy at trial was to pit the two Commonwealth experts against each other since they had conflicting views as to the cause of death. This argument is specious at best. While Dr. Hiserodt may have leaned toward an alternative form of blunt force trauma at the coroner's inquest, his testimony certainly did not contradict Dr. Davis' findings or rule out the possibility that the death was caused by "squeezing." (Tr. at 10, 16.) Furthermore, appellant's own statement to the police, standing alone, put appellant on notice that "squeezing" would be a theory the Commonwealth would explore: "I was holding her kinda tight, yes." (Transcript of appellant's statement to police, attached to trial court opinion.)

Accordingly, having found no merit in any of appellant's arguments, the judgment of sentence is hereby affirmed. Jurisdiction relinquished.

DEL SOLE, J. concurs in the result.