585 A.2d 1

**COMMONWEALTH of Pennsylvania**

v.

**Steven Patrick MIGNOGNA, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 21, 1990.

Filed Dec. 20, 1990.

Dante G. Bertani, Public Defender, Greensburg, for appellant.

John W. Peck, II, Asst. Dist. Atty., Arnold, for Com., appellee.

Before POPOVICH, JOHNSON and HESTER, JJ.

HESTER, Judge:

Steven P. Mignogna appeals from the April 14, 1989 judgment of sentence of two consecutive life terms followed by two concurrent five-to-ten-year terms of imprisonment. Sentence was imposed following his conviction of two counts of criminal homicide, and one count each of rape and statutory rape. The charges arose out of the deaths of two young girls, Melissa Baker and Penny Ansell, aged twelve and thirteen respectively. Appellant raises numerous allegations of trial court error. We vacate the judgment of sentence imposed on the rape conviction, but in all other respects, we affirm the judgment of sentence.

The evidence at trial establishes the following. On the evening of August 2, 1988, appellant and a friend, Michael Gionta, met the two victims, Melissa Baker and Penny Ansell, at a shopping center in Westmoreland County. The

girls voluntarily entered the truck which was driven by appellant, and ultimately were taken to appellant's home around 9:00 p.m. The four proceeded to a bedroom where they listened to music and talked. Melissa and appellant began to kiss each other, then left the room together, and went into another bedroom. Gionta and Penny returned to the living room downstairs. Penny then told Gionta that she had to return to her home by ten o'clock. Gionta called upstairs to appellant several times but received no response. When appellant finally appeared on the steps, he informed Penny that Melissa wished to speak with her in the bathroom.

Immediately after Penny went upstairs, Gionta heard a scream. He ran up the steps, entered the bathroom and observed Melissa lying in the bathtub, bleeding profusely from her slashed throat. Gionta's next recollection is of sitting on appellant's front porch and hearing the sound of heavy footsteps in the house. Appellant then appeared around the corner of the house and asked Gionta to assist him in bringing the girls' bodies out of the house. When Gionta refused to help appellant with the bodies, appellant told him to stay where he was. Gionta agreed, and appellant returned to the house.

Gionta then began running across a bridge in the direction of his home. He was stopped three quarters of the distance across the bridge by appellant who pulled up beside him in his truck. Appellant ordered him to enter the truck, and Gionta eventually complied out of fear for his life. Gionta then observed the victims' bodies in the back of the truck. Appellant drove the truck to a remote location where he attempted to remove the bodies from the vehicle. He twice requested Gionta's assistance, but Gionta refused. Appellant eventually succeeded in carrying the bodies to the edge of a hill. He then returned to the truck and drove Gionta to his home.

When Gionta entered his home, he informed his parents immediately about what occurred at appellant's home. Gionta and his parents immediately drove to the police

station where Gionta reported the killings. Approximately three hours later, appellant was arrested in front of his home by police and subsequently was charged with two counts of criminal homicide, one count of rape, and one count of statutory rape.

Within four hours of his arrest, appellant provided police with two statements in which he admitted taking the victims to his home on the evening of their deaths, having sexual relations with Melissa, and disposing of their bodies later the same evening. He also identified the murder weapon and indicated where it was located.

Appellant filed numerous pretrial motions including a motion to suppress the statements he made to police, all of which were denied by the trial court. Following an eight-day jury trial, appellant was convicted on all counts. On April 14, 1989, appellant was sentenced to two consecutive life terms on the homicide convictions and concurrent five-to-ten year terms, which were consecutive to the life terms, on the rape convictions. Appellant filed post-trial motions which were denied by the trial court. This timely appeal followed.

Appellant raises numerous allegations of error on appeal. We will address these issues *ad seriatim*. First, appellant contends that he was denied due process at his preliminary hearing by the admission of a statement by the main prosecution witness, Michael Gionta, implicating him in the two homicides. Since the witness did not testify during the preliminary hearing, appellant argues that the statement was hearsay, and therefore, he was denied the right to confront his accusers. The Commonwealth responds that a denial of rights during a preliminary hearing does not require reversal of the verdict in the absence of specific prejudice caused by the violation. The Commonwealth also argues that any deficiency in the preliminary hearing is rendered harmless upon a determination at trial that the Commonwealth's evidence is sufficient to be submitted to the jury. We concur with the arguments made by the Commonwealth.

 As we stated in *Commonwealth v. Harvin*, 346 Pa.Super. 575, 581, 500 A.2d 98, 100 (1985), the principal function of a preliminary hearing is to "protect an individual's right against unlawful arrest and detention." *See also Commonwealth v. District Justice Edward Verbonitz*, 525 Pa. 413, 581 A.2d 172 (1990). We further indicated that the preliminary hearing is not a trial, and the purpose is to determine whether a "sufficient case has been made out to hold the accused for prosecution." *Id.*, 346 Pa.Super. at 581, 500 A.2d at 100. While we agree with appellant's assertion that a preliminary hearing is a critical stage of the criminal process and that such hearings are not to become "hearsay mills," a defendant must establish the existence of actual prejudice arising from a denial of due process at the preliminary hearing in order to be afforded the remedy of discharge. *Commonwealth v. Gwyn*, 449 Pa. 131, 295 A.2d 73 (1972); *Commonwealth v. Rines*, 247 Pa.Super. 429, 372 A.2d 901 (1977). *But see Commonwealth v. District Justice Edward Verbonitz, supra* (plurality opinion indicating that right to cross-examination is to be afforded at preliminary hearing).[1] Appellant asserts that the admission of Gionta's statement caused the charges to be bound over for court by the district justice. A review of the evidence presented, however, makes it evident that a prima facie case had been established by the prosecution *without* Gionta's statement. The coroner's report regarding the circumstances surrounding the victims' deaths, the evidence of the location of the victims' bodies when they were found, and appellant's statements regarding his role in the killings provided sufficient evidence to establish a prima facie case that appellant had committed the offenses charged. *Compare Commonwealth v. District Justice Edward Verbonitz, supra* (where *sole* evidence used to establish prima facie case at preliminary hearing was hearsay, evidence was insufficient to bind over defendant for trial and defendant was granted habeas corpus relief). Therefore, appellant's

1. Nonmajority decisions of the supreme court are not binding. *Commonwealth v. Davenport*, 462 Pa. 543, n. 3, 342 A.2d 67, 75 n. 3 (1975); *Commonwealth v. Silverman*, 442 Pa. 211, 275 A.2d 308 (1971).

claim of prejudice arising from the admission of Gionta's statement during the preliminary hearing is inadequate, and we find no error in the trial court's ruling.

We also find that *Commonwealth v. Hess*, 489 Pa. 580, 414 A.2d 1043 (1980), a supreme court case relied upon by the Commonwealth, lends additional support to the trial court's ruling. While *Hess* concerned the question of whether an appeal from the denial of a petition for a writ of habeas corpus questioning the sufficiency of the evidence before a district justice was interlocutory, the court stated the following in discussing the issue before it: "If, in fact, it is determined at trial that the evidence of the Commonwealth is sufficient to be submitted to the jury, then any deficiency in the presentation before the district justice would have been harmless." *Id.*, 489 Pa. at 590, 414 A.2d at 1048. Since such a determination clearly was made by the trial court in the instant case and no argument is made that the alleged error tainted the verdict, the error is rendered harmless and appellant is precluded from raising the issue on appeal.

Appellant next argues that the trial court erred in failing to suppress his incriminating statements made after he indicated to police that he wished to cease discussing the event. Appellant asserts that his efforts to cease discussions with police constituted an invocation of his right against self-incrimination and that upon assertion of this right, he should have been given access to counsel. Consequently, he argues any subsequent waiver of his fifth amendment rights was invalid. In response, the Commonwealth relies upon *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), in support of its argument that incriminating statements obtained after an initial decision to remain silent can be admissible if a defendant's request to stop the questioning on each occasion was scrupulously honored.

A careful review of the record reveals the following. Appellant was arrested on August 3, 1988, at approximately 3:40 a.m. He immediately was advised of his *Miranda*

rights. Notes of Testimony ("N.T."), 3/14/89, at 155–56. He then was transported to the district police station where he was searched by Sergeant Michael Mastroianni. During the search, appellant repeatedly asked to speak to Lieutenant Charles Knoll stating, "[W]here's Charlie ... go get him, I want to see him, tell Charlie to come down, I want to talk to him." *Id.* at 125–26.

Sergeant Mastroianni relayed appellant's request to Lieutenant Knoll. *Id.* at 157. Lieutenant Knoll arrived at the station at approximately 4:15 a.m. and met with appellant while appellant was in his prison cell. Knoll again advised appellant of his *Miranda* rights, and appellant orally agreed to waive them. *Id.* at 168–69. During the interview, appellant admitted to meeting the victims, driving them to a park and to find cigarettes, and finally to his home. However, when asked about what happened at that point, appellant stated, "I don't want to talk about that right now." Lieutenant Knoll asked if would want to talk later, and appellant said yes. *Id.* at 169–70. The interview then concluded.

At approximately 7:05 a.m., Lieutenant Knoll returned with Detective William Manning to interview appellant. Appellant was taken to a different location in the station, again advised of his rights, and signed a written waiver of them. Detective Manning then informed appellant that Michael Gionta had reported the murders to the police and had given them a detailed statement about what occurred. Appellant responded that Gionta's statement was truthful. He then reiterated the events of that evening, including picking up the girls, driving them to various locations, and eventually arriving at his home. He indicated that he and Melissa went to his bedroom and then to his mother's bedroom where they engaged in sexual relations. When asked whether Melissa had agreed to have sexual relations with him, he indicated that he "sort of talked her into it." *Id.* at 204. When asked how and why he killed Melissa, he responded that he did not want to talk about that. Then appellant admitted that he summoned Penny from upstairs,

telling her that Melissa wanted to speak to her. When asked how he killed Penny, he again stated that he did not want to talk about that. He did respond to a question about where the murder weapon was located and also gave the details about his removal and disposal of the bodies. *Id.* at 204–05.

The question before us is whether the police scrupulously honored appellant's right to terminate the interrogation. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the court promulgated several safeguards to protect citizens' fifth amendment rights during interrogation. These safeguards include the requirement that police cease interrogation upon assertion of the right to remain silent. Subsequently, however, the court in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), determined that *Miranda* did not impose an absolute ban on resumption of questioning following invocation of the right to remain silent. The court ruled that a statement obtained from a defendant who initially had expressed his desire to remain silent was admissible in light of the fact that the police "scrupulously honored" his right to cease the questioning. *Id.*, 423 U.S. at 104, 96 S.Ct. at 326, 46 L.Ed.2d at 321. In determining that the police had acted properly, the court considered the following facts: 1) the defendant had been advised of his *Miranda* rights before both interrogations; 2) the officer conducting the first interrogation immediately ceased the questioning when the defendant expressed his desire to remain silent; and 3) the second interrogation occurred after a significant time lapse, was conducted in another location by another officer, and related to a different offense.

■ In the present case, as in *Mosley*, police officers properly advised appellant of his *Miranda* rights before commencing both interrogations. In addition, the officer conducting the first interrogation immediately terminated the questioning when appellant indicated that he did not wish to discuss the actual killings of the victims. Further, appellant indicated that he might discuss the killings later.

The second interrogation occurred after a three-hour time lapse, well within the "more than two" hour lapse determined by the court in *Mosley* to be "significant." *Id.*, 423 U.S. at 104, 106, 96 S.Ct. at 327, 46 L.Ed.2d at 322. The second round of questioning involving appellant also was conducted in a different location and by a different officer. While appellant's second interrogation was not about a "different" offense, this is not significant under the facts of this case. In *Mosley*, the defendant stated that he did not want to talk about his involvement in the offenses that police were discussing with him. He cut off questioning absolutely. The second interrogation related to a different crime, which the Court considered significant due to the fact that defendant absolutely invoked his right to remain silent as to those first offenses.

In the present case, appellant did not absolutely invoke his right to remain silent. He was candidly discussing the circumstances of the crime when he stated that he did not wish to discuss the actual murders "now." He indicated that he may be willing to discuss the matter later. Police ceased questioning, resumed it "later," in accordance with his request, and reiterated his *Miranda* rights prior to resumption of the questioning. Thus, the fact that the second interrogation was not about an unrelated crime is not an important factor, as it was in *Mosley*.

In this case, as in *Mosley*, the circumstances attending the defendant's invocation of his right to silence completely controlled the circumstance which attended the resumption of questioning. The purpose of the second interrogation was not to entice the arrestee to abandon his right to remain silent, but to determine whether he had a change of mind, for it was the arrestee who suggested to police during the questioning that he might wish to speak about certain matters at a later time. Police actions were irreproachable.

Thus, this is not a case in which police failed to honor a decision to terminate questioning either by refusing to discontinue the interrogation or by persisting in repeated

efforts to change appellant's mind. *See Michigan v. Mosley, supra.* To the contrary, the police immediately ceased the first interrogation upon appellant's assertion that he did not wish to talk about the manner in which he killed the victims at that time. The questioning resumed only after the passage of a significant period of time and the provision of a new set of warnings, which appellant chose not to heed. As we stated previously, we find it significant that appellant never expressed a desire to completely terminate all questioning. Indeed, he repeatedly and urgently asked to talk to Lieutenant Knoll upon his arrest, and at the conclusion of their discussion, indicated that he did not wish to discuss, *at that time,* the manner in which he killed the victims. In fact, he stated that he might wish to continue the discussion later. During the second interrogation, he freely provided additional detailed information concerning the killings and refused to answer only the questions concerning the manner in which he killed the victims. At no time did he indicate to the authorities that he wished to consult with an attorney; nor did he express a desire to completely terminate the questioning. His refusal to discuss how he committed the murders was scrupulously honored by the police. Consequently, we find no error in the trial court's ruling that appellant's statements were not obtained in violation of his *Miranda* rights.

In the third issue presented for our review, appellant contends that the trial court committed reversible error by unreasonably restricting defense counsel's questions during *voir dire.* Further, appellant argues that the trial court's restrictiveness resulted in unnecessary utilization of peremptory challenges by defense counsel. Upon review of the voluminous record of the *voir dire* examination, we find no error in the trial court's rulings on the multitude of questions put forth by defense counsel during the proceedings. Indeed, we credit the trial court in successfully seating an impartial panel without undue delay in the face of defense counsel's persistent and improper questions to the majority of panel members who were examined.

■■■ As we observed in *Commonwealth v. Hoffman,* 263 Pa.Super. 442, 398 A.2d 658 (1979), the purpose of *voir dire* is to secure a competent, fair, impartial and unprejudiced jury. During *voir dire* then, the parties are limited to determining whether a juror has a fixed opinion or may otherwise be subject to disqualification for cause. Hypothetical questions, or questions which seek to determine what a juror's decision might be, based upon the evidence to be presented at trial, are improper. *Commonwealth v. Werts,* 483 Pa. 222, 395 A.2d 1316 (1976); *Commonwealth v. Johnson,* 452 Pa. 130, 305 A.2d 5 (1973). We also have held that a juror may be impartial even though he indicates that he has formed an opinion regarding the guilt of the defendant as long as he also indicates he can lay aside that opinion and follow the law. *Commonwealth v. McBee,* 267 Pa.Super. 49, 405 A.2d 1297 (1979).

In the present case, well in advance of jury selection, the trial court requested that the prosecution and defense submit written proposed questions for *voir dire* and then held numerous discussions in chambers to review the propriety of each question submitted. N.T., 3/6/89, at 60–112, 148–150. The court's rulings on the questions were in accordance with the principles set forth in *Commonwealth v. Hoffman, supra; Commonwealth v. Werts, supra; Commonwealth v. Johnson, supra;* and *Commonwealth v. McBee, supra.* In addition, the court permitted both parties to ask follow-up questions, not approved in advance, when, for example, a juror admitted to having a preconceived opinion or that he was having difficulty understanding the nature of an approved question. N.T., 3/6/89, at 119–120, 973–980, 1224–1239.

■■■ Appellant contends that the trial court "disallowed any latitude from the question approved" and cites, as an example, an exchange with the court concerning a juror who allegedly admitted to having a preconceived opinion concerning appellant's guilt. Appellant's brief at 15. However, a review of the record of this exchange reveals that first, the question put forth by defense counsel was improp-

er in that it was an attempt to learn how the juror might view the evidence to be presented. N.T., 3/6/89, at 146–147. Second, when the juror indicated that he had a fixed opinion regarding appellant's guilt, the court itself asked numerous follow-up questions to determine whether the juror could put aside such an opinion and render an impartial decision. N.T., 3/6/89, at 135–136. It was unnecessary and repetitive for the defense to persist in asking additional questions about the source of the juror's opinion since the trial court already had exposed and resolved the issue thoroughly with the juror.

Appellant cites several other instances in which he claims that the trial court unduly restricted *voir dire*. N.T., 3/6/89, at 179, 185, 455–511, 522–530, 981–986, 1274–1279. In each instance, however, as in the example cited above, the question either was improper or was repetitive due to the follow-up questions already asked of the juror by the court itself. Appellant fails to cite a single instance in which the court unduly restricted questioning of a juror where some sign of instilled partiality was exhibited.

Similarly, we find unpersuasive appellant's related argument that the trial court's restrictions caused the defense to unnecessarily utilize peremptory challenges. The contention, once again, is based upon the claim that the court unduly restricted questioning of prospective jurors by the defense. As we find that the trial court afforded the defense reasonable latitude during *voir dire*, we conclude that the defense was not forced by the court's rulings to utilize unnecessarily its peremptory challenges.

■ Appellant asserts in his fourth argument that the trial court erred in denying his demurrer to the Commonwealth's evidence [2] on the charges of criminal homicide of Melissa Baker and Penny Ansell and on the charge of rape of Melissa Baker. We conclude that the issue as presented is not properly preserved for appellate review. In the

2. We note that appellant moved for a directed verdict, which the trial court treated as a demurrer. *See* Pa.R.Crim.P. 1124. We will treat appellant's argument in the same fashion.

seminal case on this issue, *Commonwealth v. Ilgenfritz,* 466 Pa. 345, 353 A.2d 387 (1976), the supreme court determined that since the defendant chose not to rest following the denial of his demurrer and instead elected to present a. defense, the "correctness of the ruling on the demurrer was no longer an available issue." *Id.,* 466 Pa. at 347, 353 A.2d at 388. Nevertheless, the court decided to treat the challenge as one to the sufficiency of the evidence rather than as a challenge to the propriety of the trial court's ruling on the demurrer. Since appellant herein chose to present a defense following the denial of his demurrer, the issue is waived. However, we will follow the same course as the court in *Ilgenfritz* and treat the claim as one challenging the sufficiency of the evidence. We will address the sufficiency issue in a later portion of this opinion.

■ Appellant next raises four challenges to the trial court's charge to the jury. First, he argues that the trial court erred by refusing to charge the jury with an instruction on voluntary manslaughter. Appellant relies upon *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974), in support of his assertion that when "a 'heat of passion' instruction is requested for voluntary manslaughter under section 2503(a) in a murder trial, a defendant has an unconditional right to it." Appellant's brief at 25. While we agree that *Jones* requires the provision of a heat-of-passion voluntary manslaughter instruction to a jury upon request and even in the absence of evidence to support it, we observe that the principle of *Jones* was greatly eroded by the supreme court in *Commonwealth v. Carter,* 502 Pa. 433, 466 A.2d 1328 (1983). In *Carter,* the court held that the ruling in *Jones* had no application under section 2503(b), the "unreasonable killing" voluntary manslaughter. However, because the trial court in *Carter* provided the jury with a section 2503(a) heat-of-passion voluntary manslaughter instruction, the court did not determine whether a 2503(a) charge needed to be given. Thus, since *Carter* overruled *Jones* only as to the issuance of an instruction on section 2503(b), we have held that we are obligated to apply

the rule of *Jones* where a request for a heat-of-passion instruction has been made. *Commonwealth v. Mays*, 361 Pa.Super. 554, 523 A.2d 357 (1987).

 Appellant herein clearly requested a heat of passion instruction which the trial court erroneously declined to provide. Such an error, however, does not mandate the grant of a new trial. The supreme court stated in *Jones* that the defendant must suffer prejudice as a result of the court's failure to provide such an instruction. In determining whether prejudice was established, the court stated the following:

> It is clear in this case that appellant did not suffer prejudice from the refusal of such an instruction in view of the jury's decision to ignore their right to return a verdict of second degree. There is not the slightest reason to believe that the jury would have returned a verdict of voluntary manslaughter out of sympathy or in recognition of factors that they may have deemed mitigating where these factors were not sufficiently compelling to cause them to elect the lesser alternative that was offered.

*Id.*, 457 Pa. at 574, 319 A.2d at 148 (footnote omitted). Similarly, in *Commonwealth v. Mays, supra*, we found that the trial court's failure to provide the jury, upon the defendant's request, with a heat-of-passion voluntary manslaughter instruction in a second degree murder prosecution was *not* prejudicial where the trial court instructed on first, second, and third degree murder, and the jury returned a verdict of second degree murder.

Though appellant makes a vague reference to "psychological factors" which he asserts could have provided the basis for a heat-of-passion voluntary manslaughter charge, there simply is no evidence on the record to support such a claim. Assuming, however, that *Jones* and its progeny require the provision of the instruction even in the absence of evidence supporting it, appellant has failed to establish the prejudice required for the grant of a new trial. The trial court instructed the jury on first and third degree murder, and

the jury returned a verdict of first degree murder. Just as in *Jones* and *Mays*, the jury could have exercised its mercy-dispensing power and returned a verdict of third degree murder. Instead, it found appellant guilty of first degree murder. We are persuaded, therefore, that appellant suffered no prejudice from the trial court's denial of his request for a charge on section 2503(a) heat-of-passion voluntary manslaughter.

 In his next challenge to the trial court's instructions to the jury, appellant asserts that the court erred by failing to state specifically that diminished capacity was a defense to a finding of guilt under first degree murder. Appellant's assertion is without merit. As we observed in *Commonwealth v. Kyle*, 367 Pa.Super. 484, 533 A.2d 120 (1987), and *Commonwealth v. Waters*, 334 Pa.Super. 513, 483 A.2d 855 (1984), a trial court is under no obligation to accept jury instructions submitted by counsel. If the charge adequately and accurately explains the relevant legal principles applicable to the evidence presented at trial, the instruction is proper.

In *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 28, 454 A.2d 937, 943 (1982), the supreme court recognized the "extremely limited" nature of the diminished capacity defense. Similarly, in *Commonwealth v. Davis*, 331 Pa.Super. 59, 64, 479 A.2d 1077, 1080 (1984), we stated that the diminished capacity defense could not operate to reduce the degree of a killing in the absence of a "mental disorder which affects the cognitive functions of deliberation and premeditation so as to preclude an ability to formulate and carry out a plan or design."

The trial court herein first stated during its charge to the jury on the diminished capacity defense that the psychological testimony presented on behalf of appellant was admitted for the purpose of determining whether appellant had the capacity to form the willingness, deliberateness, and premeditation necessary for first degree murder. Furthermore, the trial court informed the jury that the Commonwealth had the burden of proving that appellant possessed

the specific intent to kill, and that if they found that he was incapable of forming the specific intent, they must find appellant not guilty of first degree murder. N.T., 3/22/89, at 1562–1567. The court elaborated upon this statement three times during the diminished capacity instruction. Clearly, the instruction was adequate in light of our explanation of the defense in *Davis* and arguably more favorable to appellant than the charge deemed acceptable by the supreme court in *Commonwealth v. Zettlemoyer, supra.* Thus, we find no error in the trial court's instruction on the diminished capacity defense.

Appellant asserts two final challenges to the trial court's instructions to the jury, neither of which is persuasive. Appellant contends that the trial court failed to advise the jury that a defendant must be conscious of the intent to kill. A cursory review of the record reveals that on three separate occasions, the court instructed the jury that specific intent requires the defendant to be conscious of his intent to kill. N.T., 3/22/89, at 1559, 1560, 1561. Appellant's counsel evidently failed to conduct such a review prior to presenting argument on this issue.

Appellant finally contends that the trial court's instruction on the definition of malice necessary to support third degree murder was erroneous in that it did not comport with Pennsylvania Suggested Standard Criminal Jury Instruction 15.2502C. Once again, appellant's counsel ignores the portion of the record in which the trial court quotes the precise language of the standard instruction in defining malice in support of third degree murder. N.T., 3/22/89, at 1571. We strongly disapprove of counsel's misrepresentation of the state of the record.

Appellant's next general allegation of error relates to the trial court's decision to disallow evidence offered by him to establish the adverse effects which certain pornographic material allegedly had upon his emotional stability. Specifically, appellant contends that the trial court should have admitted into evidence various pornographic magazines and video tapes offered for sale at a pornography store which

appellant had visited on two or three occasions. The trial court ruled that the exhibits were irrelevant since the defense could not establish that appellant ever purchased any of the material at the store or that the exhibits were on display at the store on the occasions when appellant was present.

The law is well-established that the trial court enjoys broad discretion in admitting or excluding evidence. In *Commonwealth v. Meadows,* 381 Pa.Super. 354, 366, 553 A.2d 1006, 1102 (1989), we held that "[t]he admission or exclusion of evidence is a matter specifically within the discretion of the trial judge, and we will not reverse his decision absent an abuse of that discretion." *See also Commonwealth v. Barnhart,* 345 Pa.Super. 10, 497 A.2d 616 (1985) (the admission or exclusion of evidence rests within the sound discretion of the trial court); *Commonwealth v. Robinson,* 332 Pa.Super. 147, 480 A.2d 1229 (1984) (trial court's decision to admit or exclude evidence will not be disturbed absent an abuse of discretion). We defined "relevant evidence" in *Commonwealth v. Haight,* 332 Pa. Super. 269, 481 A.2d 357 (1984), as that which "logically or reasonably tends to prove or disprove a material fact in issue, or to make such a fact more or less probable, or if it affords the basis for a logical or reasonable inference or presumption as to the existence of material fact in issue." *Id.,* 332 Pa.Super. at 271, 481 A.2d at 359. *See also Commonwealth v. Greene,* 469 Pa. 399, 366 A.2d 234 (1976). Since appellant failed to establish that he viewed the pornographic tapes or magazines or that the materials were similar to those which he viewed, we conclude that the trial court acted properly in excluding the exhibits from evidence on the basis of relevance.

Appellant next challenges the sufficiency of the evidence to support the charges of criminal homicide of Melissa Baker and Penny Ansell and the charge of rape of Melissa Baker. Addressing the homicide charges first, we find appellant's argument to be entirely without merit. The well-established standard in conducting an inquiry into the

sufficiency of the evidence is whether "the evidence and all reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish the element of that offense beyond a reasonable doubt." *Commonwealth v. Jermyn*, 516 Pa. 460, 466, 533 A.2d 74, 77 (1987), citing *Commonwealth v. Nelson*, 514 Pa. 262, 523 A.2d 728 (1987). Further, a jury may believe all, part, or none of the evidence. *Commonwealth v. Carbone*, 524 Pa. 551, 574 A.2d 584 (1990).

Viewed in accordance with these standards, the evidence presented in the instant appeal established the following facts. Appellant and a friend, Michael Gionta, picked up Melissa Baker and Penny Ansell at a shopping center on the evening of August 2, 1988, and transported them in appellant's truck to appellant's home. The four went upstairs to appellant's room to listen to music and after a short time, appellant and Melissa left the room together. Gionta and Penny returned downstairs to the living room. Appellant then appeared on the stairway and informed Penny that Melissa wished to speak with her in the bathroom. Upon hearing a scream from upstairs, Gionta ran up and found Melissa bleeding to death in the bathtub with her throat cut.

Appellant then wrapped the victims' bodies in garbage bags and carried them to his truck. During this time, Gionta left appellant's home and while en route to his home, encountered appellant in his truck. Appellant insisted that Gionta get into the truck, and the two travelled to a remote area where appellant dumped the bodies, still wrapped in garbage bags, over the side of a hill. Appellant then drove Gionta home where Gionta immediately informed his parents about the murders. Gionta's parents took him to the authorities where he informed them of what had transpired that evening. N.T., 3/15/89, at 295–327.

Police arrested appellant at his home at approximately 3:40 a.m. on August 3, 1988. After his arrest, appellant admitted to the police that he picked up the victims that evening and took them to his home. He admitted to wrap-

ping the bodies in garbage bags and removing them to a dump. He also informed police of the location of the murder weapon. N.T., 3/14/89, at 169, 203–205.

Physical evidence introduced during the trial confirmed the information provided by Gionta and appellant. Blood was found in appellant's truck, in the living room of appellant's home, on the basement steps, and on a mop and sponge in the basement. Blood consistent with that of Penny Ansell was found on appellant's right tennis shoe. Blood consistent with both victims was found behind the towel rack on the bathroom wall and on the throw rug on the bathroom floor in appellant's home. N.T., 3/16/89, at 560–61. Additionally, head hair consistent with that of appellant and inconsistent with that of Gionta was found in Penny Ansell's hand. During the trial, appellant also presented testimony from Herbert Levit, a psychologist, who testified that appellant admitted to killing Melissa Baker. N.T., 3/20/89 at 1146–1148. The autopsies indicated that Melissa Baker died of stab wounds to her chest and transverse wounds to her neck, and Penny Ansell died of incised wounds to her neck. N.T., 3/15/89, at 398, 407.

Viewing the evidence in accordance with our standard for testing the sufficiency of evidence, we concur with the trial court's conclusion that there is overwhelming evidence that appellant killed Melissa Baker and Penny Ansell. Appellant's argument is that the lack of direct eyewitness evidence that he murdered both victims renders the mountain of circumstantial evidence of his guilt insufficient. This argument ignores the law and is totally facetious. The law in Pennsylvania has long recognized that circumstantial evidence may be sufficient to uphold a conviction where the inferences arising therefrom establish facts beyond a reasonable doubt. *Commonwealth v. Glasco,* 481 Pa. 490, 393 A.2d 11 (1978); *Commonwealth v. Treftz,* 465 Pa. 614, 351 A.2d 265 (1976). The massive amount of circumstantial evidence in this case is sufficient to support appellant's conviction of first degree murder.

■ Appellant also challenges the sufficiency of the evidence to support the charge of rape of Melissa Baker. Appellant contends that there is insufficient evidence that his sexual relations with Melissa Baker were committed by "forcible compulsion." We are constrained to agree. Section 3121 of the Pennsylvania Crimes Code defines rape as follows: "A person commits a felony of the first degree when he engages in sexual intercourse with another person not his spouse: (1) by forcible compulsion; ..." 18 Pa.C.S. § 3121.

The Commonwealth did produce sufficient evidence that appellant engaged in sexual intercourse with Melissa Baker in that he admitted this in his statement to Detective Manning. N.T., 3/14/89, at 204. He also told Dr. Levit, a psychologist who testified on his behalf, that he had sexual relations with Melissa. N.T., 3/20/89, at 1147. Furthermore, appellant's admissions were confirmed by physical evidence produced by the Commonwealth. The coroner testified that seminal fluid consistent with appellant's fluid was found on the vaginal swabs taken from Melissa Baker and that lacerations, contusions and a ruptured hymen were found during a vaginal examination of her. N.T., 3/15/89, at 375.

While the evidence presented by the Commonwealth clearly established that it was appellant who engaged in sexual relations with Melissa Baker on the night she was murdered, the evidence was insufficient to establish that he did so by "forcible compulsion." In its effort to establish the element of force, the Commonwealth relied exclusively on the evidence of vaginal, neck and facial injuries suffered by Melissa. The coroner testified that the autopsy revealed vaginal lacerations and contusions and a ruptured hymen. N.T., 3/18/89, at 375. The injuries to Melissa's face and neck consisted of several minor facial contusions and linear cuts on her neck consistent with the murder weapon found at the scene. Id., at 372–75, 399–403.

The evidence of the vaginal injuries, however, was inconclusive in determining whether forcible rape occurred. Dr.

Perper testified that the injuries were as consistent with a first consensual sexual experience as with a forcible rape. *Id.,* at 397–98. Similarly, the evidence of the victim's facial and neck injuries could not establish the element of force conclusively in view of the fact that the Commonwealth could not establish whether the injuries were inflicted before sexual relations occurred, or at the time the murder took place. The coroner testified only that they occurred prior to Melissa's death. *Id.,* at 375.

In ruling that the evidence supporting the rape conviction was sufficient, the trial court emphasized the victim's vaginal and facial injuries. Citing *Commonwealth v. Williams,* 476 Pa. 557, 383 A.2d 503 (1978), the court stated, "lacerations in the area of the vagina and injury to the mouth have been held sufficient to show forcible compulsion." Trial court opinion at 73. *Williams,* however, is clearly distinguishable from the case at bar in that it involved an eight-year-old victim who was incapable of consenting to the unspeakable acts inflicted upon her. The evidence established that the injuries to her mouth occurred during the sexual assault, as she was asphyxiated by penile choking. Thus, the evidence in *Williams* of forcible compulsion was overwhelming.

In contrast, the uncontroverted evidence in the case herein established that the victim was an adolescent girl who willingly accompanied an eighteen-year-old boy to his bedroom where she was observed kissing and embracing him. She also was observed voluntarily leaving the bedroom with him while holding his hand. She ultimately wound up in his mother's bedroom where she engaged in sexual relations with him. She was murdered brutally *after* the sexual act occurred. She suffered minor abrasions to her face and scratch marks on her neck prior to her death but the evidence is unclear as to whether the injuries were inflicted prior to sexual relations or when she was murdered. There is no evidence of forcible rape other than the vaginal injuries which the coroner testified were as consistent with consensual sex as with forcible rape. The injuries suffered

by the child in *Williams* were *not* consistent with consensual sexual relations.

The trial court also relied upon the differences in the parties' age and size as well as the atmosphere and physical setting in determining that the prosecution's evidence established forcible compulsion. Once again, the cases cited by the trial court in support of its conclusion are inapposite. In *Commonwealth v. Rhodes,* 510 Pa. 537, 510 A.2d 1217 (1986), the victim was an eight-year-old child who was raped by a twenty-year-old neighbor in an abandoned neighborhood house. The court held that an eight-year-old child under those coercive circumstances was incapable of voluntarily consenting to sexual relations. The victim in another case cited by the trial court, *Commonwealth v. Dorman,* 377 Pa.Super. 419, 547 A.2d 757 (1988), was older, thirteen years of age, but was raped by her thirty-eight-year old uncle. In *Dorman,* there was no evidence of consensual intimate contact prior to sexual relations.

Finally, in *Commonwealth v. Holcomb,* 508 Pa. 425, 498 A.2d 833 (1985), the last case cited by the trial court and the only one relied upon by the Commonwealth, the victim was an adult but the evidence established that she was abducted from a parking lot by a stranger who subsequently raped her, bruised her rectum, scratched her over her entire body and tore her brassiere before strangling her. Again, there was no evidence of consensual intimate contact between the victim and the defendant prior to the rape.

The elements which distinguish all of the cases relied upon by the Commonwealth and the trial court and the facts of the case before us are the evidence of consensual and intimate contact between the victim and appellant prior to sexual relations and the absence of any reliable evidence of force. The inconclusive physical evidence presented herein coupled with the eyewitness observation of the intimate nature of the contact between the victim and appellant prior to sexual relations lead us to conclude that the evidence presented by the Commonwealth was insufficient to prove beyond a reasonable doubt that appellant committed

rape by forcible compulsion. This does not mean we have determined that sexual relations were consensual. It means merely that the evidence does not establish the element of forcible compulsion under the circumstances of this case.

Appellant next contends that the prosecuting attorney unfairly prejudiced him during his closing remarks to the jury by commenting improperly on his right to remain silent, by making reference to two tests which were not administered to appellant, and in questioning the scientific basis of the evidence supporting appellant's claim of diminished capacity. Upon review of the record of the closing statement by the prosecution, we find appellant's arguments to be without merit.

Appellant first contends that the prosecuting attorney improperly commented upon appellant's decision to exercise his fifth amendment rights by pointing out the inconsistency between appellant's behavior with the first individuals to speak with him following his arrest and with what he told the psychologist who examined him six months later. During trial, appellant presented psychological testimony that he was in a dissociative state of mind when the murders were committed. The prosecuting attorney merely argued that if appellant truly had been in a dissociative state when he committed the murders, his calm, controlled, and cooperative behavior during discussions with the police within hours of the killings was inconsistent with his description of his state of mind at that time.

As the supreme court observed in *Commonwealth v. Smith*, 490 Pa. 380, 416 A.2d 986 (1980), the prosecuting attorney must have reasonable latitude in presenting a case to the jury and must be permitted to present his or her argument with logical force and vigor. Furthermore, if the prosecutor's remarks were improper in any way, their prejudicial effect must be evaluated in the context in which they occurred. *Commonwealth v. Perkins*, 473 Pa. 116, 373 A.2d 1076 (1977); *Commonwealth v. Crittenton*, 326 Pa. 25, 191 A. 358 (1937).

 Evaluating the comments by the prosecutor herein in accordance with the above-stated principles, we conclude that the remarks did not infringe upon appellant's right to remain silent. Contrary to appellant's assertion, the prosecutor did not argue that appellant's *silence* following arrest was inconsistent with the description he provided to the psychologists of his state of mind at that time. The reference was to appellant's behavior during the period in which he had waived his right to remain silent and was discussing, in great detail, the events surrounding the commission of the murders. There is an obvious distinction between a reference to a calm but expressive demeanor and silence. Since the prosecutor's comments did not constitute an unconstitutional reference to appellant's post-arrest silence, it is unnecessary to engage in the four-pronged evaluation set forth in *Commonwealth v. Gbur,* 327 Pa.Super. 18, 474 A.2d 1151 (1984), as urged by appellant. We find that the prosecutor's remarks regarding appellant's post-arrest behavior were not improper.

 Likewise, we view the two remaining claims by appellant regarding the prosecution's closing remarks as unpersuasive. The reference to the use of hypnosis and sodium amytal in the psychologists' evaluation of appellant was not improper in that it resulted from proper cross-examination in which the prosecutor challenged the reliability of the psychologists' conclusion that appellant was in a dissociative state of mind when he committed the murders. The fact that the tests are not admissible as evidence in a court of law does not invalidate their use in conducting a psychological evaluation of a patient. Similarly, the reference to the tenuous relationship of pornography, heavy metal music, and satanism to appellant's conduct in committing the offenses was proper. Contrary to appellant's assertion, the defense was permitted to present testimony on the subliminal influence of these factors on appellant's behavior through the testimony of Wilson Bryan Key. N.T., 3/20/89, at 1237–1274, 1297–1311. In his closing remarks, the prosecutor discussed the defense's failure to

establish a causal relationship between Key's theory and appellant's conduct. As such, his remarks were fair comment on appellant's defense.

■ Appellant finally contends that the trial court erred by consistently displaying hostility toward the defense in the presence of the jury. We strongly disagree. A review of the record reveals that Orlando N. Prosperi, one of appellant's trial attorneys, engaged in a course of improper and extremely irritating conduct throughout the proceedings. During *voir dire* questioning, Attorney Prosperi repeatedly deviated from the approved questions in violation of the court's order to obtain the court's permission before asking supplemental questions. He also refused to accept the court's rulings on Commonwealth objections to his questions and repeatedly engaged in extended arguments with the court over its rulings.

During trial, Mr. Prosperi persisted in asking questions to which objections had been made and sustained, remarking sarcastically at one point that "a lack of memory" caused him to forget that he had asked essentially the same, objectionable question several times. N.T., 3/19/89, at 1019–1022. This exchange prompted the trial court's retort regarding the advisability of consulting with his younger co-counsel, which appellant now finds objectionable. It was Mr. Prosperi, not the court, as appellant claims, who raised the issue of his own infirmity before the jury. Indeed, the trial court exercised tremendous restraint in its dealings with an extremely disruptive presence in the courtroom. Nearly all admonishments to Attorney Prosperi were made at sidebar and appear to be calm and reflective.

We agree with one observation by appellant concerning the record of the trial proceeding. It does indeed "speak for itself." Appellant's brief at 48. However, every instance of hostility and ridicule identified in the record was precipitated by Mr. Prosperi, without the court's involvement. We conclude that due to the trial court's valiant efforts to maintain order, however, appellant received a fair trial despite his counsel's improper behavior.

Appellant's contention regarding the order of closing presentations on the penalty phase of the proceedings is moot in that appellant received a life sentence.

Judgment of sentence on the two counts of criminal homicide and one count of statutory rape affirmed. Judgment of sentence on the one count of rape vacated. We decline to remand in light of the fact that the sentence on the rape was identical and concurrent to the sentence on the statutory rape. Thus, vacating the sentence on the rape has no effect on the sentences on the remaining counts. Appellant's sentence remains at two consecutive life sentences followed by a consecutive term of imprisonment of five to ten years.

POPOVICH, J., files a concurring opinion.

POPOVICH, Judge, concurring:

While I find much of my distinguished colleague's opinion thorough and correct in application of the law, I can concur only in the result that defendant's inculpatory statements were properly admissible under the *Mosley* decision. See *ante,* at pp. 4–7. My concern lies with the Majority's characterization of the holding in *Mosley* in a manner which distracts the inquiry from where it rightfully belongs, viz., whether the defendant's " 'right to cut off questioning' was 'scrupulously honored.' " *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). Owing to the need for particular clarity in Fifth Amendment jurisprudence, disturbing in the Majority opinion are the following statements:

> In *Mosley,* the defendant stated that he did not want to talk about his involvement in the offenses that the police were discussing with him. *He cut off questioning absolutely.* The second interrogation related to a different crime, which the Court considered significant due to the fact that defendant *absolutely invoked his right to remain silent* as to those first offenses.

In the present case, appellant did not *absolutely invoke his right to remain silent.*

*Ante,* at p. 6 (emphasis added).

The Majority cannot be faulted for their reliance on the "separateness" of the subject matters of questioning. To be sure, the significance of this "separateness" to the *Mosley* decision is not simply a matter of literary happenstance, but rather fits neatly into the test offered by the Court to preserve a defendant's right to cut off questioning. Where the police, as in *Mosley,* question the arrestee about a crime that he has not previously declined to discuss, this can be viewed as less like an attempt to wear down the arrestee and to persuade him to change his mind about confessing. But to conclude further that Mosley invoked "absolutely" his right to silence as to the robberies—but not the murder—appears an unwarranted extension of the Court's holding.

Instantly, while the Majority ascribes particular importance to the circumstances obtaining during defendant's invocation of his right to silence, namely, that it was the defendant who had suggested to the police that he might wish to speak about certain matters at a later date, this has no talisman-like quality. The police might still coerce an arrestee to comply with his or her implication that a statement will be forthcoming in violation of the Fifth Amendment. The contrary would seem equally true. If a defendant states unequivocally that he wishes to remain silent, the police may still attempt to resume questioning subsequently so long as this can be seen as nothing more than affording defendant the opportunity to make a voluntary confession as he clearly has a right to do. See *Mosley,* 423 U.S. at 109, 96 S.Ct. at 329 (White, J., concurring) (to deny defendant the right to make a voluntary confession would be to entrap him in his own privilege). To focus exclusively on the circumstances of defendant's invocation of the right, and whether it was "absolute," distracts the inquiry, for the question is not whether the invocation was "absolute" in some abstract sense, but rather whether through the re-

sumption of questioning, defendant's rights were scrupulously honored.

The principles behind *Mosley* suggest that the judicial inquiry is not so narrowly confined, nor limited, as the Majority suggests, to an exercise in absolutes. Rather, judicial inquiry in each instance should focus on the circumstances attending the defendant's invocation of his or her right to silence, as well as the circumstances attending any further attempt at questioning. Hence, the test should ask whether the official purpose of resuming questioning was to entice the arrestee to abandon his right to remain silent, or simply to find out whether he or she had a change of mind. Only then can it be concluded whether, in fact, the defendant's " 'right to cut off questioning' was 'scrupulously honored.' " *Mosley*, 423 U.S. at 104, 96 S.Ct. at 326; see also *Vujosevic v. Rafferty*, 844 F.2d 1023 (3rd Cir. 1988).

Instantly, as Judge Hester properly concludes, the facts clearly indicate that questioning was resumed merely as an effort to establish whether the defendant had changed his mind. The circumstances attending defendant's invocation of his right to silence suggested that defendant might desire to waive his right at a later date. This can be seen as *bolstering* the claim that defendant's subsequent statement was derived absent official coercion. But most importantly, as a whole the police tactics attending the subsequent attempt at questioning were irreproachable and can be seen as nothing more than affording defendant the opportunity to make a voluntary confession. Thus, while the case *sub judice* does not technically fit the *Mosley* factual paradigm, *i.e.*, the suspect herein involved was questioned about the same offense after invocation of his right to silence, the court can and does remain faithful to the principle and spirit of both the *Mosley* and *Miranda* decisions in sanctioning the resumption of questioning on the instant facts. Any reference to the possibility that a defendant might "absolutely" invoke his or her right to silence is unnecessary to the Majority's position and serves to send improper signals to our law enforcement officers.

Thus, I concur in the result only.