J-S01045-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

J.A.D.                                    :    IN THE SUPERIOR COURT OF
                                          :         PENNSYLVANIA
                                          :
          v.                              :
                                          :
                                          :
                                          :
J.M.F.                                    :
                                          :
          Appellant                       :    No. 1597 MDA 2018

Appeal from the Order Entered August 29, 2018
In the Court of Common Pleas of Wyoming County
Civil Division at No(s):  2018-00141

BEFORE:   PANELLA, P.J., MURRAY, J., and PELLEGRINI*, J.

MEMORANDUM BY PELLEGRINI, J.:                   **FILED MARCH 05, 2019**

J.M.F. (Father) appeals from the order of the Court of Common Pleas of Wyoming County (trial court), granting the parties shared legal custody, J.A.D. (Mother) primary physical custody, and Father partial physical custody with respect to the female child, A.J.F. (Child), born in December 2016.  Father had sought shared legal custody and equal physical custody of Child.  After careful review, we affirm.

On February 2, 2018, Mother filed a custody complaint seeking primary physical and shared legal custody as well as a petition for special relief, requesting temporary physical custody of Child, then fourteen months old.  On February 12, 2018, the court issued an *interim* order granting Mother primary physical custody and Father partial physical custody every Wednesday from 4:15 p.m. to 7:30 p.m.  In addition, the *interim* order granted Father partial

_____
*   Retired Senior Judge assigned to the Superior Court.

physical custody on a rotating two-week basis, as follows: Friday at 6:00 p.m. until Sunday at 9:00 a.m. in week one, and Saturday at 9:00 a.m. until Sunday at 6:00 p.m. in week two. Further, the order prohibited any paramour of Mother or Father to have contact with Child.[1]

## I.

Before we begin, to better understand what follows, it is worthwhile to set forth the well-settled law regarding custody disputes. The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and

_____

[1] At the conclusion of the subject proceeding, the trial court explained on the record in open court as follows.

> There's a reason that the court puts in orders no paramours or other individuals to have contact with the . . . Child. The court's practice is to obtain a criminal background check and a child abuse clearance on new paramours that are entered into a child's life. Why does a judge do that? Because generally, and it's not anything that has to do with your clients, but generally on a rebound after a break-up, individuals tend to not make the best decisions. That way the court intercedes and can determine how best to protect the child. So, it's not about mom[.] [I]t's not about dad. After having done thousands of custody cases, I can tell you that you don't find [N]avy [S]eals on the internet, which one individual in court had who turned out to be a sex offender and so on. So that's why the court does that. . . . [T]he court doesn't do this forever, but right now during the vulnerable period it's something that's the practice of this court. Not to punish you, but that is the practice.

N.T., 7/23/18, at 278-280.

spiritual well[-]being." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006), *citing* ***Arnold v. Arnold***, 847 A.2d 674, 677 (Pa. Super. 2004).

Child custody actions are governed by the Child Custody Act, 23 Pa.C.S. §§ 5321-5340. Trial courts are required to consider **"[a]ll** of the factors listed in section 5328(a) . . . when entering a custody order." ***J.R.M. v. J.E.A.***, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original); ***see also A.V. v. S.T.***, 87 A.3d 818, 823 (Pa. Super. 2014) (providing that trial courts shall set forth the mandatory assessment of the Section 5328(a) best interest factors "prior to the deadline by which a litigant must file a notice of appeal") (citation omitted). This statutory section provides as follows.

### § 5328. Factors to consider when awarding custody.

**(a) *Factors.*** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a). Now to the proceedings before the trial court.

- 4 -

**II.**

Hearings were held before the trial court on the custody complaint on April 18, 2018,[2] and July 23, 2018.[3]  Mother testified on her own behalf, and she presented the testimony of Joan Greulick, M.D., Child's pediatrician since birth; D.N., Father's boss at his place of employment; J.D., Child's maternal grandmother; P.S., Mother's boss at her place of employment; D.F., Mother's aunt; J.D., Mother's brother; and G.Z., Father's former girlfriend.

Father testified on his own behalf.  Father presented the testimony of Michael Church, Ph.D., a psychologist; Paul and Linda Littleford, husband and wife who are the former neighbors of Father, Mother, and Child; R.G., Father's grandmother; J.F., Child's paternal grandfather; and K.F., Child's paternal step-grandmother and wife of J.F.

---

[2] The trial court issued an order at the conclusion of the first day of testimony on April 18, 2018, that directed the parties to abide by the February 12, 2018, *interim* custody order, *inter alia*.

[3] The trial court issued an order at the conclusion of the testimonial evidence on July 23, 2018, directing that "neither party shall subject the child to anyone besides family members unless a child abuse clearance and criminal background check has been obtained, presented to the [c]ourt and presented to opposing counsel, who may file objections upon the same." Order, 7/23/18. Further, the court directed that the prior *interim* order shall remain in full force and effect pending final determination of the custody matter.

By way of background,[4] Father and Mother, who never married, cohabited at the time of Child's birth and separated in January 2018 when Child was approximately thirteen months old. TCO, 8/29/18, at 5. Mother and Child relocated to the home of Child's maternal grandparents, "approximately three (3) minutes away" from her former residence. Father purchased a single-family home on a date unspecified in the record. *Id.* Two days before the subject hearing, Mother relocated with Child to her own apartment, twelve miles from Father's home. N.T., 4/18/18, at 53, 104; N.T., 7/23/18, at 168.

Mother is employed part-time, 30 hours per week, Monday through Wednesday, from 7:00 a.m. to 5:00 p.m. N.T., 4/18/18, at 56. Father is employed full-time, Monday through Friday, from 7:30 a.m. to 4:00 p.m. TCO, 8/29/18, at 6. In addition, Father works overtime, which consists of being "on-call" for power outages for one week at a time on six-week rotation schedules. N.T., 4/18/18, at 39, at 48. Father's boss explained, "[Father] does not necessarily have to go on the call, but he is being paid to be on standby and be the person that gets notified in the particular district that they're responsible for to be sure that [an employee] can go out and respond."

---

[4] In its opinion accompanying the subject order, the trial court set forth its factual findings in this case which are undisputed. Because the testimonial evidence supports the court's findings, we adopt them herein. *See* Trial Court Opinion ("TCO"), 8/29/18, at 5-8.

*Id.* at 39-40.    Father's boss testified that his employees are "on-call" approximately eight weeks out of the year.  *Id.* at 48.

Mother and Father use the same babysitter for Child when they are at work, who provides childcare in her home.  *Id.* at 107-108.  The babysitter is located one mile from Mother's home and the babysitter is located in the same town in which Father works.  N.T., 7/23/18, at 98-99.

On August 29, 2018, when Child was twenty months old, the trial court entered an order granting the parties shared legal custody, Mother primary physical custody, and Father partial physical custody on a rotating two-week basis.  During week one, the court granted Father physical custody of Child on Tuesday, from 4:15 p.m. until 7:30 p.m., and on Friday, from 6:00 p.m. until Sunday, at 4:00 p.m.  During week two, the court granted Father physical custody on Tuesday and Wednesday, from 4:15 p.m. until 7:30 p.m.   In addition, the court granted Father two non-consecutive weeks of physical custody every year with Child and it set forth a holiday schedule.  Further, the court prohibited any of the parties' paramours from having contact with Child without court approval, *inter alia*.

In its opinion accompanying the order, the trial court considered all of the Section 5328(a) factors, except for Section 5328(a)(2.1).[5]  ***See*** Order,

---

[5] Upon review of the testimonial evidence, Section 5328(a)(2.1) is not applicable in this case. Therefore, we conclude that the court's omission is harmless.

8/29/18, at 9-15. The court found, and our review of the record confirms, that Section 5328(a)(2), (6), (7), (14), and (15) are also not applicable. The court found determinative the following factors, which the court weighted in favor of Mother: Section 5328(a)(9), which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs; Section 5328(a)(10), which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child; Section 5328(a)(11), each party's availability to care for the child or ability to make appropriate child-care arrangements; and Section 5328(a)(13), the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.

> In making that determination, the trial court found:

> Mother is primarily responsible for getting [Child, then twenty months old,] to medical appointments. . . . Mother works only three days per week and spends the other four days with the child. Mother's work is flexible so that should something happen with [C]hild, she is permitted to leave work. Father works five . . . days per week, works overtime and is on-call for week[-]long periods, during which time he is responsible for attending to work should he be called out.

TCO, 8/29/18, at 13 (citations to record omitted). In addition, the court found:

> Mother testified that she always tries to be friendly[,] but Father is always defensive with Mother. For example, Mother testified that the child's regular babysitter was going away for over two weeks[,] and Mother asked Father if her grandparents could watch the child. Father would not agree[,] and Mother had to go through her attorney to get him to approve the child's great-grandparents

- 8 -

being able to babysit.[6] On another occasion, the child had a rash on her arm[,] and when Mother transferred the child to Father, she provided the cream for the rash [to Father]. Father did not return the cream. When Mother asked for it, Father responded that he would only return the cream if Mother transferred a gun that was in Mother's name over to him. Mother had to purchase more cream [for Child's rash].

TCO, 8/29/18, at 7-8 (citations to record omitted).

Further, the trial court found Father's testimony on April 18, 2018, that he did not have a paramour or girlfriend, untruthful. *Id.* at 13-15 (citations to record omitted). The court found that Father began dating G.Z. on March 13, 2018. G.Z. testified that she became Father's girlfriend but that her relationship with Father ended several days after Memorial Day 2018. N.T., 7/23/18, at 39. Moreover, it found that Father violated the *interim* custody orders by permitting G.Z. to be in contact with Child. Specifically, the court found:

[G.Z.] has spent time with the minor child. Prior to the first day of testimony in this matter, [G.Z.] testified that she had taken the child to her niece's birthday party[;] she would hang out with the child at Father's home[;] [and] she posted pictures of the child on Facebook. [G.Z.] further testified that Father told her this [c]ourt's [o]rder prohibited Father from having the child around paramours but that she did not do anything about it because it was Father's [c]ourt [o]rder and his decision to have her around the child. . . .

TCO, 8/29/18, at 14 (citations to record omitted).

---

[6] Mother testified that at the time she made this request to Father, Child's maternal great-grandparents babysat Child previously when Child's maternal grandparents were unavailable. N.T., 4/18/18, at 109.

Based on the foregoing factual findings, which the testimonial evidence supports, we discern no abuse of discretion by the court in weighing Section 5328(a)(9), (10), (11), and (13) in favor of Mother and concluding that they are determinative in this case. *See M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (stating, "It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case."). Father then took the instant appeal.[7]

### III.

### A.

Turning to Father's contentions on appeal, he claims that the court erred in its findings regarding Section 5328(a)(1), which party is more likely to

---

[7] Our standard of review in child custody cases is as follows.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

encourage and permit frequent and continuing contact between the child and another party. In this regard, the trial court found:

> Mother and Father communicate primarily through text messaging and often times, Father does not respond to Mother's text messages. (H.T. 4/18/18, p. 202). Mother testified that she offered Father extra time with the child around Father's birthday but he did not agree. (H.T. 7/23/18, pp. 68-70, 101). Mother has unsuccessfully tried to work out a visitation schedule with Father. (H.T. 7/23/18, p. 86). Upon review of the entire record, the Court finds that Mother is more likely to encourage and permit frequent and continuing contact between the child and Father.

TCO, 8/29/18, at 10.

Father disagrees with the trial court's statement that he did not respond to Mother's text messages, that he did not agree to extra physical custody time offered by Mother or that Mother tried unsuccessfully to work out a visitation schedule. Upon review, we agree that the testimony does not clearly support these findings. While Mother's mother did testify that Father did not respond to text messages H.T. 4/18/18, p. 202, the testimony regarding visitation schedule or offering extra time is confusing and does not clearly support those findings by the court. Nevertheless, because Section 5328(a)(1) was expressly stated by the trial court not to be a determinative factor in arriving at its decision, and the trial court found that Mother is more likely to encourage and permit frequent and continuing contact between the Child and Father, we will not disturb the subject custody order.

**B.**

Father next asserts that the trial court improperly weighed Section 5328(a)(3), the parental duties performed by each party. He asserts that the court found, "There was no testimony to suggest that Father is unable or unwilling to perform his parental duties when the child is in his custody." Father's brief at 19 (citing TCO, 8/29/18, at 10). However, Father asserts that the court weighed this factor in favor of Mother insofar as she was Child's primary caretaker during her first year of life. The trial court found regarding this factor:

> Mother testified that when she was residing with Father, specifically during 2017, Mother provided the child's basic needs such as dressing, bathing, changing diapers, feeding and doing laundry. (H.T. 4/18/18, p. 93). Mother was responsible for waking with the child in the night, taking her to appointments. (H.T. 4/18/18, p. 94). Mother works only three days per week and spends the other four days with the child. (H.T. 7/23/18, p. 11). Mother's work is flexible so that should something happen with the child, she is permitted to leave work. (H.T. 7/23/18, pp. 11-12). Father's set hours are 7:30 a.m. to 4:00 p.m., Monday through Friday. (H.T. 4/1 8/18, p.37). In this position, Father is on-call for one-week rotations for power outages and the like. (H.T. 4/18/18, pp. 38-40, 7/23/18, p. 170). Father also works overtime. (I-LT. 4/18/18, p. 43, 7/23/18, p. 170). There was no testimony to suggest that Father is unable or unwilling to perform his parental duties when the child is in his custody.

TCO, 8/29/18, at 10.

While Father does not dispute any of those findings, he contends that it underestimates the care that he provided when he had custody of the Child when he fed her, bathed her, engaged in activities, dressed her, got her ready for bed and put in her bed at which time she would fall asleep. (RR 505, Lines

4-12). Father works five days a week and does not have to work overtime. The trial court found that the Father was willing and able to perform parental duties but merely stated that the Mother had been the primary caregiver, which is well supported by the evidence. We also note that the trial court did not consider this factor a determinative one in making its decision.

## C.

Next, the Father argues that the trial court made two errors in its Section 5328(a)(10) determination of what was in the best interest of the Child's emotional/mental state by relying on Dr. Greulick's expert opinion concerning the impact of a shared physical custody. First, he contends that the trial court improperly allowed Child's pediatrician to offer an expert opinion because her experience and education relates to the physical developments and health of a child and the medical care related to said development, not the child's emotional, social and cognitive development as well as behaviors. This leads to his second argument that the trial court abused its discretion by not accepting the testimony of an expert psychologist, Michael Church, Ph.D., who discredited Dr. Greulick's opinions, theories and erroneous conclusions.

## 1.

As to the trial court's allowing Dr. Greulick to testify as an expert regarding the effect of shared custody, we stated in *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 440 (Pa. Super. 1987):

> The law regarding the qualification of witnesses as experts is well established. It is true that whether a witness has been properly

qualified to give expert opinion testimony is vested in the discretion of the trial court. The Pennsylvania standard of qualification for an expert witness is a liberal one. If a witness has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his evidence is for the jury. Although the witness must demonstrate some special knowledge or skill, there is no requirement that a witness acquire that knowledge as a result of formal schooling; expertise acquired by experience is expertise nonetheless.

*McDaniel*, *supra* at 440 (citations and internal quotation marks omitted); *see also James v. Albert Einstein Medical Center*, 170 A.3d 1156 (Pa. Super. 2017).

When Dr. Greulick was being qualified as an expert, she testified that she had extensive experience in treating children, including being trained in child development with one of the world's leading experts, and that she was accustomed to making evaluations and making recommendations as to what was in the best interest for those children who were not living with both their mother and father. At the end of the questioning on direct about her qualifications, Father's counsel was asked if she wanted to cross-examine Dr. Greulick on her qualifications and she told the court she had no questions, and the trial court accepted Dr. Greulick as an expert witness. Because she was qualified as an expert to give an opinion on shared custody and Father effectively waived his argument that she was not an expert, this argument has no merit.

**2.**

As to Father's argument that the trial court abused its discretion in accepting Dr. Greulick's testimony rather than his expert, Dr. Church, regarding shared custody, Mother's counsel inquired whether there would be a developmental impact on Child if the court issued an equally shared physical custody schedule between Mother and Father,[8] and Dr. Greulick responded, in part, "that is a very difficult question to answer. . . . That's a very involved topic, but yes, a child under four [years old], he or she should spend time, and a lot of time [,] with their natural mother or their assigned mother." N.T., 4/18/18, at 26. Mother's counsel further inquired, assuming that Mother was Child's primary caretaker in the past year, what affect would a week on/week off custody schedule have on Child. *Id.* at 28-29. Dr. Greulick responded, "it would confuse [Child's] emotional status. She's not old enough to understand - just as she determined in her subconscious conscious[9] that my mother is no longer in my life, she reappears seven days later. It's extremely difficult at this age. Do you outgrow this? Absolutely, but not at sixteen months."

_____

[8] Father's counsel objected to this question, which the trial court overruled. N.T., 4/18/18, at 27. Further, the court noted a running objection to this line of questioning by Father's counsel. *Id.*

[9] Neither the parties' counsel nor the trial court questioned Dr. Greulick regarding her use of the term "subconscious conscious." Father's expert psychologist, Michael Church, Ph.D., was asked on direct examination to explain the term "subconscious conscious," and he stated, "I have no idea what [Dr. Greulick] was talking about. . . ." N.T., 7/23/18, at 129.

*Id.* at 28. Mother's counsel inquired as to Dr. Greulick's opinion regarding the period of time that Child could be away from Mother without experiencing confusion, and she responded, in part, "this is extremely impossible to answer." *Id.* at 29.

Father then presented Dr. Church, whom the court accepted as an expert in psychology. Dr. Church countered Dr. Greulick's opinion and testified, in part:

> I've taught Child and adolescent psychopathology and child development many, many times. I've never seen any reference - - that would be discriminatory. You know, what a child needs is . . . they need to have someone they're attached to, who they can feel secure with and loved. The gender of the parent for a toddler is essentially irrelevant. . . .

N.T., 7/23/18, at 128. Dr. Church testified that he is not aware of any harm Child would suffer if the court granted Father equally shared physical custody. *Id.* at 134.

In evaluating the opinions of Dr. Greulick and Dr. Church regarding physical custody, the trial court found as follows:

> Dr. Joan Greulick (hereinafter "Dr. Greulick"), the child's pediatrician testified that she has treated the minor child since her birth. Dr. Greulick testified that other than one visit, Mother and sometimes maternal grandmother, attended all of the child's pediatric visits. (H.T. 4/18/18, pp. 16, 20). Dr. Gruelick further testified that given the child's young age, it would be confusing for the child to participate in a week on — week off schedule for custody. (H.T. 4/18/18, pp. 278). Allan Church (hereinafter "Dr. Church"), a psychologist, testified as an expert on behalf of Father and he testified that it is advantageous for a child to have both parents in his or her life. (H. T. 7/23/18, p. 129). Dr. Church had four sessions between April and June of 2018 with Father to assess him as a parent. (H.T. 7/23/18, pp. 123, 143). The child only

attended one of those sessions. (H. T. 7/23/18, p. 124). Based upon these four sessions, to which the child only attended one, Dr. Church testified that he saw a very strong bond between Father and the child. (H. T. 7/23/18, pp. 125, 155). Father did not tell Mother that he was taking the child to meet with Dr. Church. (H.T. 7/23/18, p. 151). Dr. Church further testified that he did not have enough information in this particular case to determine if a fifty-fifty custody schedule would be appropriate. (H. T. 7/23/18, p. 161).

TCO, 8/29/18, at 11.

The trial court accepted Dr. Greulick's opinion that it was not in the Child's best interest to have shared custody arrangement. Because issues of credibility and weight of the evidence are deferred to the findings of the trial court and the evidence of record supports the trial court's conclusions, the trial court did not error in finding that shared custody would not be in the best interest of the child.[10]

**D.**

Father also contends that the court abused its discretion to the extent that it weighed Section 5328(a)(8), the attempts of a parent to turn the child against the other parent, in favor of Mother. The trial court acknowledged Mother's testimony that "she is 'absolutely' concerned that Father will try and

---

[10] Father also contends that Dr. Greulick's testimony that a child in its early years should be with the Mother violates 23 Pa. C.S. §5328 (b) which provides that: "no party shall receive preference based upon gender in any award granted under this chapter." While the trial court acknowledged Dr. Greulick's testimony, nowhere in the opinion did the court making any determination that it based its decision that it gave Mother sole physical custody because of her gender, only that equal physical custody would be confusing to the Child.

turn the child against her because of how Father has acted since the parties separated." TCO, 8/29/18, at 12 (citation to record omitted). Nevertheless, the court indicates neither that it weighed this factor in Mother's favor nor found it determinative. Therefore, we will not disturb the custody order on this basis.

**E.**

Next, Father contends that the court abused its discretion in weighing Section 5328(a)(9), which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the Child adequate for the Child's emotional needs, in favor of Mother. Father contends that the court found that Father loves Child "and can provide [her] with a loving home." Father's brief at 20 (citing TCO, 8/29/18, at 12). As discussed above, based on the court's factual findings that it deemed most relevant in this case, we cannot conclude that the court's order granting Mother primary physical custody and Father partial physical custody is unreasonable.

**F.**

Regarding the trial court's evaluation of the Section 5328(a)(9) factor that Father is somewhat unwilling and unable to cooperate with Mother for the Child's benefit, he argues that in coming to that conclusion, the trial court improperly found that G.F. was his paramour, that she had contact with Child, and when asked by the court, he lied about the relationship. He contends that he did not consider himself to be romantically involved with G.F. because he

J-S01045-19

did not have feelings for her that she had for him. When asked by the trial court if there are any individuals other than family members having contact with the Child, Father understood that to mean regular contact, and Father, based on his understanding of the question, believed that it would not include people that are exposed to the Child because said list would be substantial. We also note that Father testified that G.F. had purported mental health issues but still allowed contact with Child. The testimony recounted earlier in this opinion is sufficient for the trial court to find that Father violated the interim order that a paramour should not have contact with the Child.

In conclusion, upon review of the testimonial evidence, the trial court's opinion, and Father's arguments, we conclude that the court carefully and thoroughly considered Child's best interests pursuant to the requisite statutory factors, and we discern no abuse of discretion. Accordingly, we affirm the order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/05/2019

- 19 -